# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
DARREN S. BELTON,                )
                                 )
               Plaintiff,        )
                                 )
          v.                     )        1:23CV169
                                 )
RONNIE FIELDS, et al.,           )
                                 )
               Defendants.       )
```

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the Court on the Motion for Summary Judgment (Docket Entry 37), filed by Defendants Mr. Danley, Ms. Workman, and Ms. Hoover, "supported by the Affidavits of [Defendants] Danley, [] Workman, [and others, as well as] the Declaration of [Defendant] Hoover, and . . . the accompanying Memorandum" (id. at 1 (referencing, inter alia, Docket Entry 38 ("Summary Judgment Memorandum"), Docket Entry 38-1 ("Danley Affidavit"), Docket Entry 38-3 ("Hoover Declaration"), and Docket Entry 38-4 ("Workman Affidavit"))). For the reasons that follow, the Court should grant in part and deny in part the instant Motion.

### INTRODUCTION

Plaintiff commenced this case by filing a pro se Complaint against various local government officials alleging that they violated his federal constitutional rights during his time in their custody as a pretrial detainee. (See Docket Entries 1, 3; see also Docket Entry 2 (Declaration and Request to Proceed In Forma

Pauperis).)[1]  According to the Complaint, Plaintiff sought to "bring[] forth two (2) counts of excessive use of force" (Docket Entry 1 at 3 (internal parentheses omitted)), along with several other claims, including for "cruel and unusual punishment" (id.). Additionally, as explained in a recommendation entered by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 1915A(a) & (b), "the Complaint asserts a claim for sexual assault" (Docket Entry 4 at 4), but "contains no facts amounting to any sort of actual rape or sexual assault" (id.); "[h]owever, [it] do[es] allege that[, on two occasions,] Defendants [Workman and Hoover] viewed [Plaintiff] in the nude intentionally and unnecessarily and that Defendant Danley was present for the incident involving Defendant Hoover, but did not intervene" (id. at 5), which "suffic[ed] to state claims . . . based on violations of Plaintiff's right to privacy" (id.).

Upon review of that recommendation, the Court (per Chief United States District Judge Catherine C. Eagles) ruled "that [ P]laintiff's claims against [ D]efendants Danley, Workman and Hoover based on allegations of excessive force, cruel and unusual punishment, and violations of his right to privacy may proceed but

---

1 The Clerk's Office separately docketed the standard form pages of the Complaint (Docket Entry 3) and its additional pages containing information that would not fit on the form pages (Docket Entry 1).  Pin cites to both portions of the Complaint, as well as other pro se filings by Plaintiff, will refer to the page numbers that appear in the footers appended to those materials upon their docketing in the CM/ECF system.

all other claims [we]re dismissed." (Docket Entry 7 at 1 (all-caps and bold font omitted); see also id. (adopting Docket Entry 4).) Defendants Danley, Workman, and Hoover (collectively, "Defendants") answered (see Docket Entries 19, 21) and the case advanced to discovery (see Text Order dated Sept. 6, 2023), after which Defendants filed the instant Motion (Docket Entry 37), to which Plaintiff responded (see Docket Entry 46 ("Pro Se Response")).

In addition, before Plaintiff filed the Pro Se Response, he moved for an order from this Court requiring North Carolina's "Department of Adult Correction[] to allow [him] to make copies of various documents." (Docket Entry 44 at 1; see also id. (adverting to "difficulty in litigating from a prison cell"); Docket Entry 46 at 5 (asserting that "Plaintiff [wa]s currently in segregation [with] some legal documents in storage").)[2] The Court (per the undersigned Magistrate Judge) granted that motion in part by ordering "the Clerk [to] attempt to locate counsel willing to represent Plaintiff pursuant to the Court's Pro Bono Representation Program, for the purpose of filing a supplemental response to [the instant] Motion . . . and representing Plaintiff at trial, if any claim survives summary judgment." (Text Order dated July 31, 2024.) The Clerk struggled to find volunteer counsel (see Docket Notice dated Oct. 23, 2024 ("The Clerk's Office has contacted 11

---

2 Quotations from Plaintiff's handwritten materials employ standard capitalization conventions.

attorneys on its pro bono representation list, and[,] to date, no attorney has accepted representation.")), but – on December 20, 2024 – William Trivette "enter[ed an] appearance on behalf of [] Plaintiff" (Docket Entry 52 at 1).

The Court (per the undersigned Magistrate Judge) thereafter "direct[ed ] Plaintiff (through newly appearing counsel) to file any supplemental response . . . to [the instant] Motion . . . by 01/28/2025" (Text Order dated Jan. 7, 2025; see also id. (authorizing Defendants to file supplemental reply ten days after supplemental response deadline)), and later extended Plaintiff's supplemental response deadline multiple times to allow Mr. Trivette to obtain an affidavit from Plaintiff (see Text Order dated Jan. 27, 2025 (extending deadline to March 14, 2025); Text Order dated Mar. 20, 2025 (extending deadline to March 28, 2025).) On March 28, 2025, Mr. Trivette filed Plaintiff's Supplemental Response, stating therein that he "ha[d] not received [the] requested affidavit" (Docket Entry 55 at 2), but intended to "submit any affidavit subsequently received from Plaintiff" (id.). Two business days later (on April 1, 2025), Mr. Trivette moved for entry of "an order allowing [him] to file Plaintiff's attached affidavit late." (Docket Entry 56 at 1 (referring to Docket Entry 56-1 ("Plaintiff's Affidavit")).)[3]

_____

3 Pin cites to Plaintiff's Affidavit will refer to the page numbers that appear in the footer appended thereto upon docketing (continued...)

4

Defendants opposed that motion (see Docket Entry 57) and requested "an extension of time in the amount of seven (7) days, after the Court enter[ed] a ruling . . . to file a [s]upplemental [r]eply in support of the[ instant] Motion" (Docket Entry 58 at 1). The Court (again, per the undersigned Magistrate Judge) thereafter "accept[ed] Plaintiff's Affidavit as timely filed" (Docket Entry 59 at 27 (internal citation omitted)), and set a new deadline for Defendants' supplemental reply (see id. at 28), which they timely filed (see Docket Entry 60 ("Supplemental Reply")).

DISCUSSION

Overview of Plaintiff's Claims

The Complaint first alleges that, on September 2, 2022, Defendant Workman – without adequate justification and after directing racially-based comments towards Plaintiff – (A) discharged a pepper-ball gun at Plaintiff while he showered, (B) forced Plaintiff to come out of the shower area in the nude in front of her, (C) pepper sprayed Plaintiff with a different device, and (along with Defendant Danley) (D) made Plaintiff return to his cell without allowing him to wash off the pepper spray. (See Docket Entry 1 at 4-6.) Next, the Complaint alleges that, on December 10-11, 2022, Defendants engaged in this conduct:

---

3(...continued)
in the CM/ECF system. Plaintiff's Affidavit consists of a single-page, cover letter (see Docket Entry 56-1 at 1), followed by six pages of averments (see id. at 2-7).

1) Defendants Workman and Hoover came to Plaintiff's cell "around 11:30 pm" (id. at 7), with "two write ups" (id.), and Defendant Hoover ordered him to "turn around and cuff up, so [they] c[ould] come in [his] cell and take [his] towel, soap and deodorant and books and paper" (id.);

2) "then [Defendant] Hoover open[ed Plaintiff's cell-door] trap and said [to] hurry up before [she] spray[ed him]" (id.);

3) "scared of being sprayed, [Plaintiff] . . . grabbed [his] mat and covered [his cell-door] trap so [Defendant Hoover] couldn't spray [him] for nothing" (id.);

4) Defendant Danley subsequently arrived "holding a big can of pepper spray" (id. at 8), declined Plaintiff's request to talk (see id.), and instead immediately began "spray[ing] the fallger [sic] pepper spray through [his] door crack on the side" (id.);

5) when Defendant Hoover relayed to Defendant Danley that Plaintiff said he would "cuff up after [Defendant Danley] sprayed that pepper spray in [Plaintiff's] room" (id.) and he "cant [sic] breath [sic]" (id.), "[Defendant] Danley replied back, [']Let him stay in there, [h]is black ass should've been cuffed up[']" (id.);

6) "[Defendant] Hoover asked [Defendant] Danley[ if] he wanted them to stay there with [Plaintiff], since [he] couldn't breath [sic] and [Defendant] Danley was like [']no yall [sic] can come on[']" (id.), whereupon "[Defendants] Hoover and [] Workman walked away" (id.; see also id. (alleging that, when Defendants Workman

6

and Hoover returned "15 minutes to 20 minutes later," pepper-spray fog remained so strong that Defendants Workman and Hoover wore "gas masks" (stray apostrophes omitted)));

7) following another stand-off, Defendant Danley threatened "to spray the pepper spray in [Plaintiff's] room again" (id. at 9) and he submitted to restraints (see id.);

8) while "walking to the door to leave the block[, Defendant] Hoover ram[med Plaintiff's] chest into the wall which made [his] face hit the wall hard" (id.);

9) Defendant Danley then "hit [Plaintiff] in the right side of [his] ribs and got in [his] ear and said ['\]you must don't [sic] know who you [sic] playing with nigger[']" (id.);

10) Defendants Danley and Hoover thereafter placed Plaintiff in a "restraint chair" (id.) and, after he "threaten[ed] to spit in [their] face[s] for doing [him] like they did" (id.), "they got a spit mask too [sic] put over [his] head" (id.);

11) Defendants Danley, Workman, and Hoover left Plaintiff in the freezing, cool-down room for two hours in just a t-shirt and boxers (see id. at 10);

12) Defendants Workman and Hoover thereafter took Plaintiff back to his cell block "in full restraints, cuffed behind [his] back, [with the] spit mask on [his] whole head" (id.) and, after Plaintiff made vulgar comments about Defendant Hoover to other inmates while en route and complained to her that his "cuffs [were]

7

cutting [his] ankles" (id. (stray apostrophe omitted)), "she put her right leg in front of [his] left leg and slammed [him to the floor] so hard [he] blacked out for a few seconds" (id.; see also id. ("I went down head first and hit my temple so hard on the floor[ that] I blacked out."));

13) at Defendant Hoover's direction, Plaintiff then was returned to the restraint chair in the cool-down room for two more hours (see id. at 11), after which Defendants Danley and Hoover "took [him] to booking and put [him] on suicide watch[, despite the fact that he] never said [he] was gonna kill [him]self" (id.); and

14) upon placing Plaintiff in a suicide room, Defendant Hoover told him "to lay on [his] stomach" (id.), after which she "cut [his] boxers off [and] then cut [his] t-shirt off" (id. (stray apostrophe omitted)), over his protest that, as a female, she was "not supposed to be cutting [his] clothes off" (id.; see also id. ("I asked [Defendant] Danley why is a female officer cutting off a male['s] clothes, . . . [with] three male officer[s] right [t]here, [but] he didn't respon[d]" (stray comma and apostrophe omitted))).

As documented in the Introduction, at initial screening, the Court deemed the foregoing allegations sufficient to state claims "of excessive force, cruel and unusual punishment, and violations of [Plaintiff's] right to privacy . . . ." (Docket Entry 7 at 1.) Given Plaintiff's status as a pretrial detainee at the time of the alleged events, those three claims all arise under "the Due Process

8

Clause [of the Fourteenth Amendment, which] of its own force requires that conditions of confinement satisfy certain minimal standards for pretrial detainees . . . ." Collins v. City of Harker Heights, 503 U.S. 115, 127 (1992). Starting with the first of those three claims, the United States Supreme Court "ha[s] said that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015) (internal quotation marks omitted). "[S]uch 'punishment' can consist of actions taken with an 'expressed intent to punish,'" id. at 398 (quoting Bell v. Wolfish, 441 U.S. 520, 538 (1979)), as well as "actions [that] are not 'rationally related to a legitimate nonpunitive governmental purpose' or that . . . 'appear excessive in relation to that purpose,'" id. (quoting Bell, 441 U.S. at 561); see also id. at 396 ("hold[ing] that courts must use an objective standard").

Turning to Plaintiff's claim for cruel and unusual punishment, although that terminology comes from the Eighth Amendment, "a Fourteenth Amendment claimant is entitled to at least as much protection as an Eighth Amendment claimant," Short v. Hartman, 87 F.4th 593, 608 (4th Cir. 2023), and therefore "whatever treatment violates the Eighth [Amendment] violates the Fourteenth [Amendment]," id.; see also Bell, 441 U.S. at 533 (agreeing that "Due Process Clause protects a detainee from certain conditions and restrictions of pretrial detainment"). "But it does not follow

9

that treatment violates the Fourteenth [Amendment] only if it violates the Eighth [Amendment]." Short, 87 F.4th at 608. To the contrary, "the proper inquiry is whether th[e allegedly cruel and unusual] conditions amount to punishment," Bell, 441 U.S. at 535 (emphasis added), "[f]or under the Due Process Clause, a [pretrial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law," id.; see also id. at 536-37 ("A person lawfully committed to pretrial detention has not been adjudged guilty . . . . [T]he [g]overnment [thus] may detain [such persons] to ensure [their] presence at trial and may subject [them] to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution."). In other words, Plaintiff's claim for cruel and unusual punishment effectively turns on the "distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may." Id. at 537; see also Short, 87 F.4th at 609 (observing that, in drawing that distinction, "*Bell* applied [an] objective standard to a challenge to a variety of [detention] conditions, . . . not just to excessive force claims," but that "a showing of subjective intent can still help a pretrial detainee state a claim for action that amounts to punishment, because punishment can consist of actions taken with an expressed intent to punish" (internal quotation marks omitted)).

10

Lastly, although the United States Supreme Court has described "[l]oss of . . . privacy [as an] inherent incident[] of confinement in [a pretrial detention] facility," Bell, 441 U.S. at 537, the Fourth Circuit has held that – in light of (A) Bell's construction of the Due Process Clause as prohibiting pretrial detainees' "'punishment' under the guise of, or as an incident of, a generally authorized detention," Fisher v. Washington Metro. Area Transit Auth., 690 F.2d 1133, 1142 (4th Cir. 1982), abrogated in part on other grounds, County of Riverside v. McLaughlin, 500 U.S. 44 (1991), (B) subsequent authority "recogniz[ing] that[,] even with respect to persons incarcerated by the state following conviction, there are minimally retained rights of personal privacy subject to constitutional protection," id., which include freedom from "involuntary exposure of an inmate's genitals in the presence of people of the other sex [] when not reasonably necessary," id. (internal brackets and quotation marks omitted), and (C) the principle that pretrial detainees possess "rights of privacy under the due process clause [that] are necessarily more substantial in general than [the privacy rights] of convicted inmates," id. – "a pretrial detainee [] ha[s] a general right, constitutionally protected, not to be subjected by state action to involuntary exposure in a state of nakedness to members of the opposite sex unless that exposure was reasonably necessary in maintaining [the pretrial detainee's] otherwise legal detention," id.

11

The instant Motion contends that the Court should enter summary judgment for Defendants on "Plaintiff's claims asserted against them in this matter on the grounds that there is no genuine issue as to any material fact and that they are each entitled to judgment as a matter of law." (Docket Entry 37 at 1.) "More specifically, [the instant Motion maintains that] Plaintiff was not subjected to any excessive or unlawful force, nor any other violation of his constitutional rights, such that [D]efendants are each entitled to qualified immunity and [] Plaintiff's claims otherwise fail as a matter of law." (Id.)

To bolster Defendants' request for summary judgment in their favor on Plaintiff's claims arising from the incident on September 2, 2022, Defendants have pointed to evidence that "[D]efendant Workman informed Plaintiff that his allotted shower time was finished and ordered [him] to get dressed, come out from behind the shower curtain, and to 'cuff up' so that he could be . . . escorted back to his cell." (Docket Entry 38 at 5 (citing Docket Entry 38-2, ¶ 9 and Docket Entry 38-4, ¶ 9).) According to the Summary Judgment Memorandum, only after Plaintiff repeatedly refused to comply with those and similar, lawful commands (see id. at 6 (citing Docket Entry 38-2, ¶ 10 and Docket Entry 38-4, ¶ 9)), even in the face of warnings that Defendant Workman "would deploy a pepper ball gun into his shower cell/stall in an effort to obtain

12

his compliance" (id. (citing Docket Entry 38-2, ¶ 11 and Docket Entry 38-4, ¶¶ 9, 10)), did "[Defendant] Workman attempt[] to deploy the pepper ball gun" (id.), which – due to a malfunction – resulted in "merely [a] discharge[ of] empty air" (id. (citing Docket Entry 38-2, ¶ 11)). The Summary Judgment Memorandum concludes (as to that incident) by detailing that, after Defendant Danley arrived and "correct[ed] the malfunction with the pepper ball gun" (id. (citing Docket Entry 38-1, ¶ 3, Docket Entry 38-2, ¶ 13, and Docket Entry 38-4, ¶ 12)), "Plaintiff finally complied with . . . lawful orders" (id.), culminating in his return "to his cell without further incident" (id. at 7 (citing Docket Entry 38-1, ¶¶ 3-5, Docket Entry 38-2, ¶ 14, and Docket Entry 38-4, ¶ 13)), all with – contrary to the allegations in the Complaint (see Docket Entry 1 at 5-6) – "[n]o force [] utilized against [him], to include any deployment of oleoresin capsicum (whether from a pepper ball gun or a can of OC spray)" (Docket Entry 38 at 7 (citing, inter alia, Docket Entry 38-1, ¶¶ 6, 7, Docket Entry 38-2, ¶¶ 14-18, and Docket Entry 38-4, ¶¶ 13-15)).[4]

_____

4 The Workman Affidavit also indicates that Defendant Workman did not compel Plaintiff to bare his genitals to her. (See Docket Entry 38-4, ¶¶ 11 (averring that, when Defendant Workman "warned [Plaintiff] that [she] would use [her] OC spray if he did not obey [her] commands to come out of the shower," Plaintiff "began getting dressed behind the shower curtain"), 13 (averring that, after Defendant Danley's arrival with operational pepper gun, Plaintiff "complied with [Defendant Workman's] commands to get dressed").)

Regarding the incident on December 10-11, 2022, the Summary Judgment Memorandum similarly relies on record evidence to defeat Plaintiff's claims. (See generally id. at 7-13 (citing principally Docket Entries 38-1, 38-3, and 38-4).) For example, in contrast to the Complaint's allegation that Defendant Danley refused Plaintiff's entreaty to talk and instead immediately deployed the pepper-spray fogger (see Docket Entry 1 at 8), the Summary Judgment Memorandum cites evidence that Defendant Danley first made multiple, verbal attempts to gain compliance, to which Plaintiff responded with open defiance, including by challenging Defendant Danley to "'spray, do what you do'" (Docket Entry 38 at 8 (citing and/or quoting, inter alia, Docket Entry 38-1, ¶ 10, Docket Entry 38-3, ¶ 5, and Docket Entry 38-4, ¶ 18)). Likewise, in contradiction of the Complaint's allegations that (with Plaintiff fully restrained) Defendant Hoover slammed Plaintiff into a wall (see Docket Entry 1 at 9), Defendant Danley punched Plaintiff in the ribs (see id.), and Defendant Hoover kicked Plaintiff's legs out from under him with such force that his head smashed into the floor knocking him unconscious (see id. at 10), the Summary Judgment Memorandum directs the Court to evidence that "Plaintiff was not hit, struck, or kicked in any manner by anyone" (Docket

Entry 38 at 12 (citing Docket Entry 38-1, ¶ 24, Docket Entry 38-3, ¶ 23, Docket Entry 38-5, ¶ 10, and Docket Entry 38-6, ¶ 9)).[5]

<u>Overview of Plaintiff's Affidavit</u>

Via the filings reviewed in the prior subsection, Defendants have "assert[ed] that [specific] fact[s bearing on liability] cannot be . . . disputed [and have] support[ed] th[at] assertion by . . . citing to particular parts of materials in the record, including . . . affidavits or declarations . . . ." Fed. R. Civ. P. 56(c)(1). To contest Defendants' showing on that front, i.e., to "assert[] that [those] fact[s are] . . . genuinely disputed," <u>id.</u>, Plaintiff, as the party "bear[ing] the burden of proof on [liability] at trial . . . may not simply rest on assertions in

_____

5 The Summary Judgment Memorandum additionally cites evidence to show that Defendants attempted to maintain order and security in the jail by twice confining Plaintiff in a restraint device/cart away from other detainees for two-hour stints after he resisted lawful orders, threatened violence, and caused disturbances. (<u>See</u> Docket Entry 38 at 8-11 (citing, inter alia, Docket Entry 38-1, ¶¶ 12-15, 17, 18, Docket Entry 38-3, ¶¶ 8-12, 14, 15, and Docket Entry 38-4, ¶¶ 21-24, 26-29).) Further, per the Summary Judgment Memorandum (citing supporting evidence), when those attempts proved ineffective at calming Plaintiff, Defendants "place[d him] into a safety observation cell . . . where he could be personally observed at least four times an hour" (<u>id.</u> at 11-12 (citing, inter alia, Docket Entry 38-1, ¶ 20, Docket Entry 38-3, ¶ 18, and Docket Entry 38-4, ¶ 29)), and where "[Defendant] Hoover, who as a Corporal was authorized by policy to utilize safety shears, used them to remove [] Plaintiff's t-shirt and shorts, which could not be removed intact because [he] was still restrained in handcuffs and leg restraints for officer safety" (<u>id.</u> at 12 (citing, inter alia, Docket Entry 38-1, ¶ 21, Docket Entry 38-3, ¶ 19, and Docket Entry 38-4, ¶ 29)); <u>see also</u> <u>id.</u> ("Inmates who are placed in a safety observation cell are dressed in a suicide smock/ gown made of rip-proof material to protect them from self-harm.")).

15

the[ C]omplaint but must produce evidence that could – if believed – permit a reasonable factfinder to rule in [his] favor," <u>Alexander v. Connor</u>, 105 F.4th 174, 178 (4th Cir. 2024).[6]

As detailed in the Introduction, at the time of the Supplemental Response's filing, Plaintiff had "fail[ed] to properly support [his] assertion[s] of fact [substantiating his claims and had] fail[ed] to properly address [Defendants'] assertion[s] of fact [contradicting his claims] as required by [Federal] Rule [of Civil Procedure] 56(c)," Fed. R. Civ. P. 56(e). Nevertheless, because (as described in the Introduction) the Court (per the

_____

6 "[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991) (emphasis omitted). But Plaintiff did <u>not</u> verify the Complaint. (<u>See</u> Docket Entry 1 at 1-11 (containing no signature, let alone any verification under oath or penalty of perjury); Docket Entry 3 at 11 (bearing Plaintiff's signature without verification under oath or penalty of perjury).) Plaintiff did incorporate into his Pro Se Response a single-page document labeled "Affidavit." (Docket Entry 46 at 9 (all-caps font omitted).) However, although that document recites that Plaintiff had "be[en] duly sworn" (<u>id.</u>), the section for administration of the oath lacks any notarization (<u>see</u> <u>id.</u>; <u>see also</u> <u>id.</u> at 8 ("Certificate of Acknowledgement [sic]" confirming via notary Plaintiff's identity as person who signed Pro Se Response, but offering no representation about oath administration (bold font omitted))). In any event, that document contains no factual matter; rather, it merely makes a bald assertion that "[t]here is a material disagreement . . . as to the versions of events of excessive force . . . in the Moore County Jail." (<u>Id.</u> at 9.) The preceding pages of the Pro Se Response also contain only conclusory comments of that sort. (<u>See, e.g.</u>, <u>id.</u> at 2 (alleging without any context that "Plaintiff was beaten"), 3 (referring generically to "incident of excessive force"), 4 (adverting in undeveloped fashion to "brutal[,] willful[,] malicious[,] sadistic[,] unjustified[, and] excessive force that occurred").)

undersigned Magistrate Judge) accepted Plaintiff's Affidavit as timely filed, the Court must assess whether that evidence establishes the existence of a material factual question precluding the entry of summary judgment in Defendants's favor.

In making that assessment, the Court should note first that Plaintiff's Affidavit sets out, "under penalty [of] perjury" (Docket Entry 56-1 at 7), Plaintiff's account of matters about which he possessed "personal knowledge," Fed. R. Civ. P. 56(c)(4), concerning "facts that would be admissible in evidence," id., and while "show[ing] that [he] is competent to testify on th[ose] matters," id.; in particular, as to the incident on September 2, 2022, Plaintiff averred, consistently with the Complaint:

1) after initially telling Plaintiff that he "had 10 minutes [to shower]" (Docket Entry 56-1 at 2), Defendant Workman – apparently angered by Plaintiff's singing – "told [him] to get [his] black ass out of the shower" (id.), after he had "only been in the shower for like 2 or 3 minutes, [and while he] still had soap on [his] body" (id.);

2) when Plaintiff "told [Defendant Workman that he] still had soap on [his] body[, ] she replied back saying 'you think I'm playing with you nigger'" (id.);

3) Plaintiff then asked Defendant Workman and another female officer nearby "could they move out of site [sic] so they couldn't see [his] naked body" (id.), to which Defendant Workman responded

17

by "point[ing a] pepper gun at [him] and pull[ing] the trigger"
(id. at 3), which resulted in "pepper dust c[oming] out" (id.);

4) despite Plaintiff pleading to "[Defendant] Workman 'please
dont [sic] shoot me, it's not that serious'" (id.), she "pulled the
trigger again and nothing but dust came out again" (id.), before
she "tried to shoot [him a] third time and told [him] to come from
behind the curtain" (id.);

5) "[Plaintiff] told [Defendant] Workman [he] still was naked
and she told [him] to hurry [his] black ass up and that she don't
[sic] care if [he] was butt naked" (id.);

6) "[Plaintiff] came from behind the curtain butt naked in
front of [Defendant] Workman and [the other female officer and]
asked both female officer's [sic] could they move while [he was]
getting dress[ed, to which Defendant] Workman replied 'no'" (id.);

7) "[Plaintiff] asked them could they at least turn they [sic]
head and [Defendant Workman] pulled her pepper spray and told [him]
to get dress[ed] and [he] told her [he] was still wet and she just
pepper sprayed [him] and her" (id.); and

8) at that point, Defendant Danley arrived and Plaintiff "told
[Defendant Danley that Plaintiff] needed to get the pepper spray
off [himself, but Defendants Danley and Workman] both said no"
(id.), before they "walked [him] to [his] room and locked [him] in
[his] cell with pepper spray still on [him]" (id.);

18

Plaintiff's Affidavit also contains these averments about the events of December 10-11, 2022:

1) upon arriving at Plaintiff's cell to serve him with "two write ups" (id. at 4), "[Defendant] Hoover told [Plaintiff] to turn around so they could take [his] property" (id.) and "[Defendant] Workman walked up and opened [Plaintiff's cell-door] trap and said 'hurry up and turn around or I'll pepper spray you'" (id.);

2) "not wanting to be pepper sprayed (again)[, Plaintiff] grabbed [his] bed/mat . . . and covered [his] trap so [he] couldn't be pepper sprayed" (id.; see also id. (admitting that Plaintiff "told them if [they] pepper spray[ed him] for nothing, [they would] have to come in [t]here and fight [him]"));

3) Defendant Hoover briefly departed and then returned "holding a cell phone recording [Plaintiff's] room[, at which point Defendant] Danley walked up and [Plaintiff] asked [if he] could [] speak with [Defendant Danley]" (id.; see also id. ("[Plaintiff] told [Defendant] Danley [that Defendants Hoover and Workman] w[ere] try[ing to] spray [Plaintiff] for no reason.")), to which Defendant Danley "replied, 'it's [sic] nothing to talk about'" (id.), "and sprayed pepper spray in the crack of [Plaintiff's] cell door and walked away" (id.);

4) "[a]fter being sprayed[, Plaintiff] immediately told [Defendant] Hoover [that he would] submit to the hand-cuff's [sic] and [that he] couldn't breathe" (id. at 5), but "[Defendant] Danley

19

yelled to [Defendant] Hoover, [']Let his black ass stay in there he should have already been cuffed'" (id.; see also id. ("[Defendant] Hoover ask[ed if Defendant Danley] want[ed] her to stay there with [Plaintiff] and [Defendant Danley] replied 'no, yall [sic] can come on.' That's when [Defendants] Hoover and Workman followed [Defendant] Danley and [Plaintiff] couldn't breath [sic] [and] had to wet [a] t-shirt and put it over [his] mouth to breeve [sic]."));

5) "[a]bout 15 to 20 minutes pass[ed before Defendants] Workman and Hoover returned . . . wearing gas masks" (id.), at which point – having "cleaned as much spray/pepper spray as [he] could" (id.) and still "so mad" (id.) – Plaintiff "told them to get away" (id.), but "then hear[d Defendant] Danley returning to spray [] again, so [Plaintiff] said, 'okay I'll cuff up'" (id.; see also id. ("[Defendant] Hoover pop[ped Plaintiff's] trap and [he] turned around and put [his] hands through the trap and was handcuffed and they put leg restraints on [him]."));

6) once out of his cell, Plaintiff began "asking them where [he] was going (talkin [sic] and cussing)" (id.);

7) as "soon[ as they were a]bout to be out [of] the block[,] she ram[med him] to the wall and [he] hit [his] head and [the] right side [of his] face" (id.), at which time "[Defendant] Danley walked up to the right side of [Plaintiff] and hit [him] in the ribs and spoke into [his] ear and said, 'you dont [sic] know who you fucking with nigger'" (id.);

20

8) from that point, "[Defendant] Hoover took [Plaintiff] off the way [sic] . . . and they walked [him] into the hall way [sic] and started putting [him] in the restraint chair and took [him] to the coldest room [he] ever felt before in [his] life" (id.; see also id. at 5-6 ("They call it the 'cool down room.' On the way . . . [, Plaintiff] was cursing them out for what they done [sic] to [him]. [Defendant] Danley . . . call[ed Plaintiff] all type of nigger's [sic] and say [sic] he hope[d Plaintiff] get[s] raped everyday in prison. . . . [T]hey hook[ed him] up to something and made fun of [him] and then left the [cool down] room. [He] had threatened to spit in the[ir] face[s be]cause they was [sic] hurting [him] and they put a spit mask on [his] face. In the cool [down] room[, Plaintiff] was only wearing boxer [shorts], sock's [sic], and [a] t-shirt and the room was so cold [he] couldnt [sic] feel [his] leg's [sic]." (parentheses omitted)));

9) "[t]hey return[ed] two hours later and unhook[ed Plaintiff] and took [him] out [of] the restraint's [sic] and started walking [him] back to the block and [he] ask[ed Defendant] Hoover could she slow down because the leg restraint's [sic] was [sic] cutting [his] skin" (id. at 6), to which she responded by "put[ting] her leg in front of [his] left leg and us[ing] force and slam[ming him] on [his] head/temple so hard [he] went to sleep and when they picked [him] up that [was] what woke [him] up and [he] had leg restraints,

21

hands cuffed to [his] back, [and] spit mask on" (id.; see also id. ("[A]ll I was doing was cursing her out."));

10) "[t]hey picked [Plaintiff] up and put [him] back in the restraint chair . . . and let [him] sit in the cool down room for (2) two more hours" (id.);

11) "after the two hours was up[, t]hey took [Plaintiff] to booking" (id.), where he saw "three male officer[s] standing waiting on [him]" (id.), one of whom "help[ed Defendant Hoover] pick [Plaintiff] up out [of] the chair so they could take the body restraint's [sic] off" (id.), after which "[Defendant] Hoover told [Plaintiff] to lay on [his] stomach" (id.); and

12) Plaintiff "asked for what and [Defendant] Hoover replied 'so I can cut your clothes off,' and [he] replied why when it's [sic] three male [officers] right here" (id.), but "she kept on cutting [Plaintiff's] clothes off and help[ed him] stand up[, ] made [him] back up naked with handcuff's [sic] on behind [his] back and she took the cuff[s] off" (id. at 6-7).

### Overview of Summary Judgment Standard

"The [C]ourt shall grant summary judgment if [Defendants] show[] that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for [Plaintiff]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

22

(1986).  When considering summary judgment, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to [Plaintiff]."  Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

Put another way, as a general proposition, Plaintiff "is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, and all internal conflicts in it resolved favorably to him."  Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (internal brackets and quotation marks omitted).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007); see also Harris v. Pittman, 927 F.3d 266, 276 (4th Cir. 2019) ("Scott is the exception, not the rule. . . .  Summary judgment is proper under Scott only when there is evidence – like the videotape in Scott itself – of undisputed authenticity that shows some material element of the plaintiff's account to be blatantly and demonstrably false." (internal quotation marks omitted)).  To sum up, if "a reasonable jury could return a verdict for [Plaintiff], then a genuine factual dispute exists and summary judgment is improper."  Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996); see

23

also <u>Anderson</u>, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

<u>Analysis of Claims from September 2, 2022</u>

<em>Excessive Force by Defendant Workman</em><br>
<em>(Use of Pepper Gun/Pepper Spray in Shower Area)</em>

As detailed previously, the Complaint alleges that, without any legitimate justification, Defendant Workman used excessive force on September 2, 2022, by first "pepper gunn[ing Plaintiff] while naked in the shower" (Docket Entry 1 at 3) and then using another device to "spray[ him]" (<u>id.</u> at 6). Based on their affidavit/declaration evidence (recounted above), Defendants maintain that "Plaintiff was not subjected to any force by [D]efendant Workman or anyone else on September 2, 2022, to include the effective use of a pepper ball gun (which instead malfunctioned) or a handheld can of OC pepper spray." (Docket Entry 38 at 19.) Plaintiff's Affidavit, however, avers (A) that Defendant Workman's first firing of the pepper gun resulted in "pepper dust c[oming] out" (Docket Entry 56-1 at 3) and (B) that, when she "pulled the trigger again[,] . . . dust came out again" (<u>id.</u>), as well as (C) that Defendant Workman thereafter "pulled her pepper spray" (<u>id.</u>) and "pepper sprayed [Plaintiff]" (<u>id.</u>). For purposes of summary judgment, in the face of the parties' competing averments, Plaintiff "is entitled to have the credibility of his evidence as forecast assumed," <u>Miller</u>, 913 F.2d at 1087.

24

Defendants have countered that the Court nonetheless should grant Defendant Workman summary judgment on this excessive force claim because, "[e]ven had any pepper ball gun or OC spray been deployed, . . . such use would have been lawful under the circumstances." (Docket Entry 38 at 19 (citing <u>Underwood v. Martin Cnty. Sheriff's Off.</u>, No. 07-14050-CIV, 2008 WL 2561928, at *5 (S.D. Fla. May 27, 2008) (unpublished), <u>recommendation adopted</u>, 2008 WL 2544428 (S.D. Fla. June 25, 2008) (unpublished)).) Beyond the citation to <u>Underwood</u> and a vague reference to "other cases cited supra" (<u>id.</u> (underscoring omitted)), Defendants neglected to develop this argument (<u>see</u> <u>id.</u>). "A party should not expect a court to do the work that [the party] elected not to do." <u>Hughes v. B/E Aerospace, Inc.</u>, No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.). Nor does Defendants' mere invocation of <u>Underwood</u> self-evidently establish Defendant Workman's entitlement to summary judgment <u>under the facts viewed in the light most favorable to Plaintiff</u> (as the Court must view them at this stage, <u>see</u> <u>Henry</u>, 652 F.3d at 531), particularly given that the Summary Judgment Memorandum only quotes that case for this limited, general principle:

> "Courts have held that even simple inmate recalcitrance, in the form of refusal of verbal orders, may <u>in appropriate circumstances</u> justify the use of force (e.g., the application of mace in non-dangerous amounts), to obtain inmate compliance so as to maintain institutional order, even when the inmate is in handcuffs, or locked in his cell when the chemical agent is used."

25

(Docket Entry 38 at 18 (emphasis added) (internal quotation marks omitted) (quoting Underwood, 2008 WL 2561928, at *5).

Here, Defendants have presented evidence by affidavit/ declaration that, after Plaintiff's 10-minute shower-period ended, Defendant Workman faced "recalcitrance, in the form of refusal [by Plaintiff] of verbal orders," Underwood, 2008 WL 2561928, at *5. (See, e.g., Docket Entry 38-4, ¶¶ 6-11.) If the evidentiary record ended there, the Court likely could have found the existence (as a matter of law) of "appropriate circumstances justify[ing] the use of . . . mace[] in non-dangerous amounts[], to obtain [Plaintiff's] compliance so as to maintain institutional order, even [though he wa]s . . . locked in [a] cell when the chemical agent [wa]s used." Underwood, 2008 WL 2561928, at *5. But the evidentiary record does not end with Defendants' averments; rather, it also includes Plaintiff's statements under penalty of perjury that Defendant Workman (A) cut short Plaintiff's shower time because she objected to his singing, (B) directed racist insults at him, (C) discharged her pepper gun when he asked her not to stand where she could view him naked, (D) forced him to appear before her naked, and (E) pepper sprayed him with another device when he asked her to turn her head while he dressed. (See Docket Entry 56-1 at 2-3.)

"[T]aking th[at] evidence and all reasonable inferences drawn therefrom in the light most favorable to [Plaintiff]," Henry, 652 F.3d at 531, a reasonable fact-finder could determine that

26

Defendant Workman's discharge of her pepper gun and use of her pepper-spray device constituted "excessive force that amounts to punishment," Kingsley, 576 U.S. at 397 (internal quotation marks omitted), because her "actions [we]re not rationally related to a legitimate nonpunitive governmental purpose or . . . appear[ed] excessive in relation to that purpose," id. (internal quotation marks omitted). The Court therefore should deny summary judgment on Plaintiff's excessive force claim against Defendant Workman for her actions during the incident on September 2, 2022.[7]

---

7 Defendants' Supplemental Reply accurately quotes the factors listed by the United States Supreme Court that "may bear on the reasonableness or unreasonableness of the force used," Kingsley, 576 U.S. at 397. (See Docket Entry 60 at 5 ("[T]he following factors may be considered: 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" (quoting Kingsley, 576 U.S. at 397)).) Defendants' application of those factors to the record, however, does not "tak[e] the [record] evidence and all reasonable inferences drawn therefrom in the light most favorable to [Plaintiff]," Henry, 652 F.3d at 531; for example, the Supplemental Reply describes Plaintiff as a "male pending trial for violent felonies (and with a lengthy history of violent crime)" (Docket Entry 60 at 5), but the United States Supreme Court "ha[s] stressed that a court must judge the reasonableness of the force used . . . with the knowledge of the defendant officer," Kingsley, 576 U.S. at 399, and the Workman Affidavit does not state that Defendant Workman knew any of that information on September 2, 2022 (see generally Docket Entry 38-4). Similarly, the Supplemental Reply attributes to Plaintiff the admission that he "refused to obey repeated orders to allow officers to secure and remove him from the shower stall." (Docket Entry 60 at 5.) In fact, viewed "in the light most favorable to [him]," Henry, 652 F.3d at 531, Plaintiff's Affidavit shows not that he "refused to obey repeated orders" (Docket Entry 60 at 5), but only (A) that, when Defendant Workman

(continued...)

27

*Privacy Violation by Defendant Workman*
*(Compelled Display of Genitals in Shower Area)*

Defendants have requested summary judgment on "Plaintiff['s] claim[] that his right to privacy was violated by [D]efendant Workman on September 2, 2022, when she purportedly ordered him to come out from behind the shower curtain while he was nude" (Docket Entry 38 at 23), on the ground that said claim "fail[s] as a matter of law" (id.). In pressing that request, Defendants have conceded that even convicted "prisoners' rights can be violated where

---

7(...continued)
"told [him] to get [his] black ass out of the shower" (Docket Entry 56-1 at 2), after he had "only been in the shower for like 2 or 3 minutes . . . [and] still had soap on [his] body" (id.), he told her that he "still had soap on [his] body and she replied back saying 'you think I'm playing with you nigger'" (id.), (B) that he then manifested his intent to comply with her order to get out of the shower by asking her to "move out of site [sic] so [she] couldn't see [his] naked body" (id.), at which point (before any actual refusal to comply with any order), she "pointed the pepper gun at [him] and pulled the trigger" (id. at 3), (C) that he pleaded with her not to "'shoot [him]'" (id.), but she "pulled the trigger again" (id.), (D) that she next "tried to shoot [him] the third time and told [him] to come from behind the curtain" (id.), insisting that he "hurry [his] black ass up and that she don't [sic] care if [he] was butt naked" (id.), (E) that he complied with her order and "came from behind the curtain butt naked in front of [her]" (id.), (F) that he asked her to "move while [he was] getting dress[ed]" (id.) or "at least turn [her] head" (id.), but she refused and instead "pulled [out] her pepper spray" (id.), and (G) that she "told [him] to get dress[ed] and [he] told her [he] was still wet and she just pepper sprayed [him]" (id.). So understood, the record would support factual findings adverse to Defendant Workman on five of the six Kingsley factors, i.e.: "the relationship between the need for the use of force and the amount of force used," Kingsley, 576 U.S. at 397; her "effort . . . to temper or to limit the amount of force," id.; "the severity of the security problem at issue; the threat [she] reasonably perceived . . .; and whether [P]laintiff was actively resisting," id.

observations of their nude bodies by members of the opposite gender occur . . . intentionally and unnecessarily." (Id. at 24 (internal citation omitted).) And Defendants have not questioned Plaintiff's entitlement to the same protection as a pretrial detainee; rather, they have argued that, "[i]n the instant case, any brief, one-time observation by [Defendant] Workman . . . of [] Plaintiff's nude body was either unintentional or necessary under the circumstances or was instead by [] Plaintiff's choice." (Id.) To support that argument, the Summary Judgment Memorandum states (without record citation) that "[Defendant] Workman repeatedly ordered [] Plaintiff to get dressed behind the shower curtain and then come out from behind it to 'cuff up.'" (Id.)

Elsewhere, the Summary Judgment Memorandum cites the Workman Affidavit, the affidavit of another officer, and (in the final instance) the Danley Affidavit as the evidentiary basis for factual statements (A) that, on September 2, 2022, Defendant Workman "ordered Plaintiff to get dressed, [to] come out from behind the shower curtain, and to 'cuff up'" (id. at 5 (citing Docket Entry 38-2, ¶ 9 and Docket Entry 38-4, ¶ 9)), (B) that, after Plaintiff "refused to comply with [that] lawful order" (id. at 6), "[Defendant] Workman repeated her commands to Plaintiff to get dressed, come out from the shower curtain, and 'cuff up'" (id. (citing Docket Entry 38-2, ¶ 10 and Docket Entry 38-4, ¶ 9); see also id. ("Plaintiff continued to refuse to comply.")), and

29

(C) that, only when "[c]onfronted by three [d]etention [o]fficers and an operational pepper ball gun, [did] Plaintiff finally compl[y] with the [o]fficers' lawful orders to get dressed, come out from behind the shower curtain, [and] 'cuff up'" (id. at 6-7 (citing Docket Entry 38-1, ¶¶ 3-4, Docket Entry 38-2, ¶ 14, and Docket Entry 38-4, ¶ 13)). But that affidavit evidence conflicts with Plaintiff's Affidavit, in which he stated under penalty of perjury, inter alia, that:

1) before the conclusion of Plaintiff's allotted shower time, Defendant Workman (in a fit of pique brought on by Plaintiff's singing) "told [him] to get [his] black ass out of the shower" (Docket Entry 56-1 at 2);

2) Plaintiff asked Defendant Workman to "move out of site [sic] so [she] couldn't see [his] naked body" (id.);

3) without addressing Plaintiff's request, Defendant Workman "pointed the pepper gun at [him] and pulled the trigger" (id. at 3; see also id. (averring that, when he pleaded with her not to "'shoot [him],'" she "pulled the trigger again"));

4) after Defendant Workman "tried to shoot [Plaintiff a] third time[, she] told him to come from behind the curtain" (id.), with the further directives that he must "hurry [his] black ass up and that she don't [sic] care if [he] was butt naked" (id.);

5) "not wanting to get hurt[, Plaintiff] came from behind the curtain butt naked in front of [Defendant] Workman" (id.); and

6) Plaintiff asked Defendant Workman to "move while [he was] getting dress[ed]" (id.) or "at least turn [her] head" (id.), but she refused and instead "pulled her pepper spray" (id.).

The Court should deny summary judgment for Defendant Workman on this claim because, "taking the [foregoing] evidence and all reasonable inferences drawn therefrom in the light most favorable to [Plaintiff]," Henry, 652 F.3d at 531, a reasonable fact-finder (A) could reject Defendants' contentions (i) that "Plaintiff [] chose to come out from the shower curtain before getting dressed" (Docket Entry 38 at 24 (emphasis omitted)), i.e., "that [it] was his decision, not [Defendant] Workman's" (id.), and (ii) that "any purported observation of [] Plaintiff's nude body was unintentional on [Defendant] Workman's part" (id.), and instead (B) could find that Defendant Workman violated Plaintiff's Fourteenth Amendment right, as a pretrial detainee, "not to be subjected by state action to involuntary exposure in a state of nakedness to members of the opposite sex," Fisher, 690 F.2d at 1142, because the facts do not show "that [such] exposure was reasonably necessary in maintaining h[is] otherwise legal detention," id.[8]

---

8 The Supplemental Reply does not develop any theory by which, upon accepting Plaintiff's above-quoted averments as true, the Court could grant summary judgment for Defendant Workman on this claim. (See Docket Entry 60 at 1-6 (focusing, in discussion of claims from September 2, 2022, on alleged lawfulness of any use of pepper gun/pepper spray by Defendant Workman).) Defendants did include within the Supplemental Reply a footnote stating:

(continued...)

*Improper Punishment by Defendants Danley and Workman*
*(Denial of Pepper-Spray Decontamination in Shower Area)*

Consistent with Plaintiff's assertion of a claim for "Cruel and Unusual Punishment" (Docket Entry 1 at 3), which the Court allowed to proceed (alongside claims for excessive force and privacy violations) (see Docket Entry 7 at 1), the Complaint

---

8(...continued)
If exposure of his "naked body" was truly of concern to Plaintiff, the Court may take judicial notice that a first grader would have recognized that he could reach around the shower curtain to retrieve his towel and clothes to dry himself off and get dressed, all while continuing to cover himself with/behind the shower curtain.

(Id. at 3 n.5.) "The [C]ourt may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the [ C]ourt's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); see also Fed. R. Evid. 201(c)(2) (mandating that courts "must take judicial notice if a party requests it and the court is supplied with the necessary information"). In this situation, evidence supplied by Defendants appears to contradict the notion that (behind the shower curtain or otherwise) Plaintiff independently could "retrieve his towel" (Docket Entry 60 at 3 n.5). (See Docket Entry 38-4, ¶ 6 (indicating that, after "tak[ing] a shower, [detainees] dry off with the towel that we provide them through the shower cell/stall door" (emphasis added)).) Given that consideration, the conflicting nature of the parties' other averments about what transpired in the Moore County jail's shower area, and the lack of wide-spread knowledge or readily available, reliable resources about the configuration of that shower area, the Court should decline (at least at this juncture) to conclude that Plaintiff's ability to "reach around the shower curtain to retrieve his towel and clothes . . ., all while continuing to cover himself with/behind the shower curtain" (Docket Entry 60 at 3 n.5) "is not subject to reasonable dispute," Fed. R. Evid. 201(b), based on either "general[] know[ledge] within the [Middle District of North Carolina]," Fed. R. Evid. 201(b)(1), or "sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2).

32

alleges that, shortly after Defendant Workman "sprayed [Plaintiff]"

(Docket Entry 1 at 6), Defendant Danley arrived in the shower area,

whereupon Plaintiff complained that he "still had pepper spray on

[him and wanted to] wash it off" (id.), but Defendants Danley and

Workman would not let him decontaminate there, telling him to "get

it off in [his] room" (id.).[9]   In seeking summary judgment,

Defendants did not expressly address the potential liability of

Defendants Danley and Workman for their refusal of Plaintiff's

request to decontaminate in the shower area. (See Docket Entry 38

at 19 (arguing that "there was no violation of Plaintiff's rights"

on September 2, 2022, because "undisputed facts demonstrate that

[he] was not subjected to any force . . . to include the effective

use of a pepper ball gun . . . or a handheld can of OC pepper

spray" and because, alternatively, "such use would have been

lawful"); but see Docket Entry 37 at 1-2 (making clear that

Defendants sought summary judgment on all Plaintiff's claims).)

---

9 Construing Plaintiff's allegations about denial/delay of
decontamination as a claim for cruel and unusual punishment makes
sense because (A) courts regularly adjudicate "decontamination-
related eighth-amendment claims," Anderson-Bey v. Graham, No.
1:22CV798, 2024 WL 2784876, at *11 n.11 (M.D.N.C. May 30, 2024)
(unpublished), recommendation adopted, 2024 WL 3203255 (M.D.N.C.
June 27, 2024) (unpublished), and (B) whether those courts decide
those cases under the standard for "deliberate indifference," id.
(internal quotation marks omitted) (citing cases), or "consider[]
them under the excessive force [standard]," id. (internal quotation
marks omitted) (citing exemplar case), "the determinative question
[in those cases] remains the same: did the defendants inflict
'cruel and unusual punishment' on the plaintiff," id. (internal
brackets and citation omitted) (quoting U.S. Const. amend. VIII).

Thereafter, neither Plaintiff's Pro Se Response nor his Supplemental Response (filed by Mr. Trivette) mentioned any decontamination-related claim or allegations (much less the Summary Judgment Memorandum's failure to discuss any such claim or allegations). (See generally Docket Entries 46, 55.) However, Plaintiff's Affidavit clearly harkened back to the Complaint's inclusion of decontamination-related content with these averments:

> . . . [Defendant Workman] pulled her pepper spray and told me to get dress[ed] and I told her I was still wet and she just pepper sprayed me and her.
>
> I heard [Defendant] Danley ask what was going on and I told him [Defendant] Workman just sprayed me for nothing at all. But he didn't care and I told him I needed to get the pepper spray off me and they both said no [Defendant] Workman and [Defendant] Danley and walked me to my room and locked me in my cell with pepper spray still on me.

(Docket Entry 56-1 at 3 (emphasis added).)

Following that prompting, Defendants also engaged on this issue in the Supplemental Reply, quoting the above-underscored sentence from Plaintiff's Affidavit and then pointing out that "Plaintiff['s Affidavit] does not claim that he experienced any adverse effects or consequences whatsoever from any pepper spray, nor does [it] contend he was prevented from or otherwise unable to use the sink in his cell to wash off any purported pepper spray." (Docket Entry 60 at 4; see also id. at 4 n.8 (supporting assertion that cell to which Defendants Danley and Workman returned Plaintiff on September 2, 2022, contained a sink by citing to page five of

34

Plaintiff's Affidavit as "Plaintiff['s] confirm[ation] . . . that the cells in Green Block, where he was housed during both incidents about which he complains, were equipped with sinks he could use to clean any OC off himself" (internal quotation marks omitted)).)[10] The Supplemental Reply subsequently offers this argument:

> . . . Plaintiff's version of events demonstrates that any purported use of pepper spray by [Defendant] Workman on September 2, 2022 was objectively reasonable and that there was otherwise no violation of Plaintiff's rights. . . .
>
> . . . Even if [Defendant] Workman deployed pepper spray as Plaintiff claims, such use would have been in direct response to Plaintiff's refusal to obey lawful commands . . . . OC spray[] may be used in order to control recalcitrant inmates. Again, Plaintiff does not claim he suffered any adverse consequences whatsoever from any purported use of pepper spray.
>
> In sum, no rational trier of fact could conclude that [Defendant] Workman (or anyone else) used excessive force or otherwise violated Plaintiff's rights on September 2, 2022. Accordingly, [Defendant] Workman (and all [D]efendants) are entitled to . . . summary judgment as to Plaintiff's claims regarding "Incident Number One."

(Id. at 4-6 (emphasis added) (internal citations and some quotation marks omitted); see also Docket Entry 56-1 at 2 (labeling averments about events on September 2, 2022, as "Incident Number One").)

_____

10 The page from Plaintiff's Affidavit cited by Defendants (which discusses Plaintiff's removal from his cell on December 10-11, 2022) does not actually confirm the presence of a sink in that cell (let alone all cells in Green Block) (see Docket Entry 56-1 at 5); however, it does indicate the presence of some water source in the cell Plaintiff occupied on December 10-11, 2022, by averring that, after Defendant Danley deployed the pepper spray fogger into that cell, Plaintiff "wet [a] t-shirt and put it over [his] mouth" (id.; see also id. (averring that, while confined in that cell, Plaintiff "cleaned as much spray/pepper spray as [he] could")).

35

Based on the foregoing record material (and despite the somewhat haphazard manner in which this matter has come to a head), the Court should conclude that (A) Plaintiff asserted a claim under the Fourteenth Amendment (though labeled as a claim for cruel and unusual punishment) predicated on the refusal of Defendants Danley and Workman to permit Plaintiff to remove pepper spray from his body in the shower area, (B) Defendants Danley and Workman moved for summary judgment on that claim, (C) Plaintiff offered evidence pertaining to that claim, and (D) Defendants Danley and Workman argued that, notwithstanding that evidence, they remain entitled to judgment as a matter of law on that claim.

With that framing in place, the Court next should note that the Fourth Circuit recently confronted a convicted-prisoner-plaintiff's "conten[tion] that the [prison-official-]defendants violated the Eighth Amendment by failing to decontaminate him in a timely manner after his exposure to pepper spray." Moskos v. Hardee, 24 F.4th 289, 297 (4th Cir. 2022). In that case, the convicted-prisoner-plaintiff gave testimony that one of the prison-official-defendants created a pretext for another prison-official-defendant to "spray[ the convicted-prisoner-plaintiff] with a can of pepper spray, hit him in the head with the can, and put him in a choke hold." Id. at 293. "Following the altercation, the [prison-official-defendants] brought [the convicted-prisoner-plaintiff] to the prison's segregation unit, where he was assessed

36

by [a n]urse," id., to whom he "complained that his eyes were burning," id. "[She] ordered that he be decontaminated of the pepper spray immediately but the [prison-official-defendants] instead returned [him] to his cell [to await a full medical examination]." Id. "As a result, [the convicted-prisoner-plaintiff] claims that he was only decontaminated after the full medical examination, approximately 90 to 120 minutes after the pepper spray had been used against him." Id. (emphasis omitted).

The Fourth Circuit analyzed the resulting claim as an "Eighth Amendment deliberate indifference claim[]," id. at 297, which required the convicted-prisoner-plaintiff to "establish two things," id. "First, he must prove an objective element: a deprivation of a basic human need that is sufficiently serious. And second he must prove a subjective element: that the [prison-official-defendants] acted with a sufficiently culpable state of mind." Id. (internal citation and quotation marks omitted). The Fourth Circuit held that, "[e]ven under [the convicted-prisoner-plaintiff's] account, [] there was no Eighth Amendment violation, because the objective prong [wa]s not satisfied." Id. In doing so, the Fourth Circuit explained that the convicted-prisoner-plaintiff only "experienced the usual transitory effects of pepper spray for a period of, at most, 90 to 120 minutes," id. at 298; see also id. (observing that the convicted-prisoner-plaintiff "did not testify to any serious medical reaction or to any pain beyond the

37

normal discomfort of pepper spray"), which the Fourth Circuit characterized as "a short delay in decontamination," id.  Because such "facts [] do not remotely resemble cases where [the Fourth Circuit] ha[d] found the objective prong [of the Eighth Amendment deliberate indifference standard] to be met," id., the Fourth Circuit "conclude[d] that the district court properly granted judgment as a matter of law [against the convicted-prisoner-plaintiff] on th[at] claim," id.

Given that, as in Moskos, the instant record (as previously discussed) lacks evidence (A) that Plaintiff suffered any impact beyond the norm from the pepper-spray discharge in the shower area, and (B) that he could not decontaminate in his cell after the brief delay for his escort back there, any claim under the Eighth Amendment's deliberate indifference standard would fail as a matter of law.  "But it does not follow that treatment violates the Fourteenth [Amendment] only if it violates the Eighth [Amendment]." Short, 87 F.4th at 608.  Due to Plaintiff's status as a pretrial detainee, "the proper inquiry is whether th[e challenged] conditions amount to punishment," Bell, 441 U.S. at 535, which (in this instance) requires the Court to assess whether the denial of decontamination in the shower area (and related delay during Plaintiff's return to his cell) constituted "punitive measures that may not constitutionally be imposed prior to a determination of guilt [or] regulatory restraints that may," id. at 537.

38

To make that assessment, the Court first must decide if Plaintiff has "show[n ] an expressed intent to punish on the part of [Defendants Danley and Workman]," id. at 538; see also Short, 87 F.4th at 609 ("[A] showing of subjective intent can still help a pretrial detainee state a claim for action that amounts to punishment, because punishment can consist of actions taken with an expressed intent to punish." (internal quotation marks omitted)). Plaintiff's Affidavit (quoted in relevant part above) does not show that Defendants Danley and/or Workman expressed an intent to punish Plaintiff when they denied his request to decontaminate in the shower area; rather (according to Plaintiff), they just "both said no . . . and walked [him] to [his] room" (Docket Entry 56-1 at 3).

"Absent a showing of an expressed intent to punish . . ., th[e Court's] determination [of whether Defendants Danley and Workman improperly punished Plaintiff] generally will turn on whether an alternative purpose to which [their action] may rationally be connected is assignable for [their action], and whether [their action] appears excessive in relation to the alternative purpose assigned to [their action]." Bell, 441 U.S. at 538 (internal brackets and quotation marks omitted). "Thus, if [the denial of decontamination in the shower area wa]s reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." Id. at 539 (internal quotation marks omitted); see also id. ("Conversely, if a [governmental action] is

39

not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." (italics omitted)). Here, Defendants Danley and Workman "ha[d] legitimate interests that stem[med] from [the] need to manage the facility in which [Plaintiff wa]s detained." Id. at 540. "For example, [they] must be able to take steps to maintain security and order at the institution . . . ." Id.

In that vein, Defendants have submitted detailed evidence about the laborious "standard procedure . . . in the Moore County Detention Center for . . . [handling Green Block detainees, like Plaintiff, who] wanted to take a shower" (Docket Entry 38-4, ¶ 5). (See Docket Entry 38-2, ¶¶ 6-7; Docket Entry 38-4, ¶¶ 5-7.) The procedure requires two officers to take at least eight discrete steps (including handcuffing the detainee through a cell-door trap, clipping the handcuffs to a lanyard through that trap, opening the cell-door, shackling the detainee's legs, escorting the detainee from the cell to the shower area, unshackling the detainee's legs, opening the shower cell door, and removing the detainee's handcuffs through a slot in the shower cell door) just to maneuver each detainee from the detainee's cell into a shower cell. (See Docket Entry 38-4, ¶ 5.) At that point:

> Once [the two officers have] secure[d] an inmate inside
> of the shower stall/cell so that he can take a shower,

40

> [they] secure and remove the inmate who has finished his shower from the adjacent shower stall, secure him with handcuffs and leg shackles, and escort him back to his cell, where [they] reverse the process to remove the leg shackles and handcuffs and secure the inmate in his cell. [They] then move on to the next cell in line, where [they] secure and remove the inmate from his cell and escort him to the empty shower stall to take a shower. It takes a significant amount of time for [the officers] to return an inmate from the shower stall to his cell and thereafter to remove, secure, and escort the next inmate from his cell to the shower stall [], such that the inmate who has been actively showering should be at or near the end of th[at inmate's] allotted 10 minutes to take a shower by the time that [the officers] return to the shower stalls with another inmate.

(Id., ¶ 6.)

"[The officers] follow this methodical, orchestrated process until every inmate in Green Block who wants to take a shower has had the opportunity to do so." (Id.) Per the uncontested evidence of record (detailed above), "this is a very labor-intensive procedure." (Id., ¶ 7.) As a consequence, the officers "do not allow inmates any additional time to take a shower, as doing so would disrupt [the] carefully choreographed and methodical process of ensuring that all inmates are afforded the opportunity to take a shower." (Id.; see also Docket Entry 38-2, ¶ 7 ("To do otherwise . . . will disrupt [the] carefully orchestrated procedures and efforts, which will result in chaos in the Detention Center.").)

Under these circumstances, the Court should grant summary judgment for Defendants Danley and Workman on this claim, because (A) they possessed a legitimate objective of maintaining order by avoiding (further) disruption of the detainee-shower process after

41

Plaintiff's confrontation with Defendant Workman, and (B) the refusal to allow Plaintiff to decontaminate in the shower area (in favor of returning him to his cell for decontamination) "[wa]s reasonably related to [that] legitimate governmental objective," Bell, 441 U.S. at 539, such that it did not "amount to punishment," id. (internal quotation marks omitted). That conclusion adheres to the United States Supreme Court's admonition that the Court must apply the Bell standard without regard to "[the C]ourt's idea of how best to operate a detention facility." Id. More particularly:

> In determining whether restrictions or conditions are reasonably related to the [g]overnment[al] interest in maintaining security and order and operating [a detention facility] in a manageable fashion, courts must heed [the Bell Court's] warning that such considerations are peculiarly within the province and professional expertise of [facility] officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to the[ officials'] expert judgment in such matters.

Id. at 540 n.23 (internal brackets and quotation marks omitted); see also id. at 544 ("The court might disagree with the choice of means to effectuate those interests [in security and order], but it should not second-guess the expert [facility] administrators on matters on which they are better informed. Concern with minutiae of [facility] administration can only distract the court from detached consideration of the one overriding question presented to it: does the practice or condition violate the Constitution?" (internal ellipsis and quotation marks omitted)).

42

<u>Analysis of Claims from December 10-11, 2022</u>

*Excessive Force by Defendant Danley*
*(Deployment of Pepper-Spray Fogger into Cell)*

According to the Complaint, when Defendants Workman and Hoover came to Plaintiff's cell to serve him with disciplinary papers, just before midnight on December 10, 2022, Defendant Hoover directed him to "cuff up, so [they] c[ould] come in [his] cell and take [some items]" (Docket Entry 1 at 7), with the added warning "[to] hurry up before [she] spray[ed him]" (<u>id.</u>); yet – rather than comply – Plaintiff "grabbed [his] mat and covered [his] trap so she couldn't spray [him] for nothing" (<u>id.</u>). Plaintiff admittedly also threatened "[Defendant] Hoover [that,] if [officers] spray[ed him] with th[eir] pepper spray, [they would] have to come in [t]here and fight [him]" (<u>id.</u>) and thereafter cursed Defendant Hoover (<u>see</u> <u>id.</u>). Next, the Complaint alleges (A) that (consistent with an earlier request from Plaintiff) Defendants Workman and Hoover "called [Defendant] Danley and he came up the stair's [sic] holding a big can of pepper spray" (<u>id.</u> at 8; <u>see also</u> <u>id.</u> at 7 (alleging that, shortly after Defendants Workman and Hoover arrived at Plaintiff's cell, he requested to "speak to [Defendant] Danley")), and (B) that Plaintiff then "asked [Defendant] Danley [if Plaintiff] could [] speak to him" (<u>id.</u> at 8). Per the Complaint, "[Defendant] Danley replied back [that there was] nothing to talk about and walked up to [Plaintiff's] door and sprayed the fallger

43

[sic] pepper spray through [the] door crack on the side, and turned around and started walking back to the stair's [sic]."  (Id.)

Defendants have argued for summary judgment on any excessive force claim predicated on those allegations on the ground that "[Defendant] Danley's deployment of a 2-second burst of OC fogger into Plaintiff's cell was objectively reasonable, given Plaintiff's refusal to obey lawful command's [sic] to 'cuff up' so that he could be removed from his cell and his threats to attack any officer who entered his cell."  (Docket Entry 38 at 20.)  As evidentiary support for the argument that "[Defendant] Danley deployed a 2-second burst of OC fog through a gap in the cell door doorframe for the purpose of overcoming Plaintiff's resistance and combativeness and to compel his compliance with lawful orders to 'cuff up'" (id. at 8), Defendants cited portions of the Danley Affidavit, Hoover Declaration, and the Workman Affidavit (see id. (citing Docket Entry 38-1, ¶¶ 8-10, Docket Entry 38-3, ¶ 5, and Docket Entry 38-4, ¶¶ 17-19)), as well as Exhibit 1 to the Hoover Declaration and Exhibit 2 to the Danley Affidavit (see id.).  Those exhibits consist of matching video recordings of Defendant Danley's interaction with Plaintiff on this occasion, taken by Defendant Hoover with Defendant Danley's cellular telephone.  (See Docket Entry 38-1, ¶ 10 (detailing Defendant Danley's repeated orders to Plaintiff to submit to handcuffs and Plaintiff's repeated refusals, even after a warning that Defendant Danley "would deploy the OC

44

fogger into [Plaintiff's] cell if he refused to obey [the] commands to 'cuff up,'" and then concluding with these averments: "Because [Plaintiff] had made it clear that he was not going to obey our commands to 'cuff up,' I deployed a two (2) second burst of OC fogger into his cell through the top left corner of his cell door at approximately 11:17 p.m. I had asked [Defendant] Hoover to use my official issued cell phone to record my warnings to [Plaintiff] and his responses. A copy of the recording of my interaction with [Plaintiff] at his cell door is contained on a CD-ROM attached to th[e Danley] Affidavit and identified as Exhibit 2."); Docket Entry 38-3, ¶¶ 5 ("[Defendant] Danley handed me his official cell phone . . . to record his efforts to get [Plaintiff] to comply before having to resort to using the OC fogger. [Defendant] Danley ordered [Plaintiff] to turn around and 'cuff up' several times, warning [Plaintiff] that [Defendant Danley] would deploy the OC fogger if [Plaintiff] did not comply with this order. [Plaintiff] refused to 'cuff up' . . . . [Defendant] Danley administered a two-second burst of OC fogger into [Plaintiff's] cell through the door frame."), 6 ("My recording of this incident is contained on the CD-ROM attached to th[e Hoover] Declaration as Exhibit 1."); see also Docket Entry 42 at 1 ("[Defendants] have manually filed Exhibit 2 to the [Danley] Affidavit . . . and Exhibit 1 to the [Hoover] Declaration . . . . These exhibits are cell phone video recordings from the December 10-11, 2022 incident . . . .").)

45

The Supplemental Response, in turn, gives this description of the foregoing events: "[Defendant] Danley arrived on the scene with a big container of pepper spray. Plaintiff told [Defendant] Danley that [Plaintiff] had done nothing wrong but [Defendant] Danley sprayed pepper into [Plaintiff's] cell." (Docket Entry 55 at 7; see also Docket Entry 46 at 2 (arguing that the instant Motion "is without merit and not clear" and stating, as to "video," that "Plaintiff [was] unable to view per prison difficulty"), 5 ("Defendant[s] presented no facts or evidence or exhibits to defeat Plaintiff['s] claim[s. They j]ust disagree with [Plaintiff's] facts.").) Plaintiff's Affidavit elaborates as follows:

> I than [sic] saw [Defendant] Hoover holding a cell phone recording my room and [Defendant] Danley walked up and I asked [him] could I speak with him. I was happy to see him because I knew what [Defendants] Workman and Hoover was [sic] doing was wrong. They wasnt [sic] following they [sic] facility policie[s]. Which [sic] I told [Defendant] Danley they was tryna [sic] spray me for no reason. And he replied, "it's [sic] nothing to talk about." Than [sic] he walked up and sprayed pepper spray in the crack of my cell door and walked away.

(Docket Entry 56-1 at 4.) The Supplemental Reply answers back:

> As Plaintiff['s Affidavit] states, the event was captured in a cell phone video recording, which is included in Exhibit 2 to [the] Danley[] Affidavit. This video evidence is conclusive as to the deployment of the OC fogger into Plaintiff's cell, including [Defendant] Danley's repeated warnings to Plaintiff and Plaintiff's repeated refusals and threats in response, and confirms the objective reasonableness of [Defendant] Danley's deployment of the OC fogger. This video recording, which is not subject to any other interpretation, clearly dispels Plaintiff's contentions . . . .

(Docket Entry 60 at 7 (internal citations omitted).)

46

The referenced video recording (hereinafter, the "Fogger-Use Video"), in fact, confirms Defendants' accounts (and conclusively disproves Plaintiff's account) of Defendant Danley's interaction with Plaintiff leading up to Defendant Danley's deployment of the pepper-spray fogger, including by proving that:

1) at Plaintiff's door (the cell-door trap and window of which remained blocked from the inside), Defendant Danley calmly said "Mr. Belton, I need you to turn around and cuff up" (Fogger-Use Video, 00:00-00:03);

2) Plaintiff asked "for what" and Defendant Danley responded that Defendants needed "to remove [Plaintiff's] belongings from the cell" (id., 00:04-00:08);

3) Plaintiff disputed the need for his removal from the cell and became agitated, while Defendant Danley calmly insisted that Plaintiff must submit to handcuffs (see id., 00:09-00:32);

4) Plaintiff continued to refuse to comply with that order and challenged Defendant Danley to "get [his] shield" and to "spray" (id., 00:33-00:37);

5) Defendant Danley warned Plaintiff that Defendant Danley would "administer fog if [Plaintiff did not] turn around and cuff up" (00:38-00:41); and

6) after waiting several seconds, Defendant Danley asked "is that a refusal" and Plaintiff answered "yeah," after which Defendant Danley deployed the fogger (id., 00:42-00:50).

47

Simply put, "[t]he [Fogger-Use V]ideo[] quite clearly contradicts the version of the story told by [Plaintiff] . . . ." Scott, 550 U.S. at 378. Where, as here, the "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, [the C]ourt should not adopt that version of the facts for purposes of ruling on [the instant M]otion," id. at 380; rather, the Court must "view[] the facts in the light depicted by the [Fogger-Use V]ideo[]," id. at 381.[11] "Judging the matter on that basis, . . . it is quite clear that [Defendant Danley's use of the pepper-spray fogger] did not violate the [Fourteenth] Amendment." Id.

To that end, to succeed on this excessive force claim under the Fourteenth Amendment, Plaintiff "must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley, 576 U.S. at 396–97 (emphasis added). The United States Supreme Court has identified certain considerations that "may bear on the reasonableness or unreasonableness of the force used," id. at 397, namely:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

---

11 "There are no allegations or indications that th[e Fogger-Use V]ideo[] was doctored or altered in any way," Scott, 550 U.S. at 378. (See Docket Entries 46, 55, 56-1.)

48

Id. The Court must assess objective reasonableness "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. Additionally, the Court must account for Defendant Danley's legitimate interests in managing the facility, "appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." Id. (internal brackets and quotation marks omitted).

The first Kingsley factor (i.e., the relationship between the need for the use of force and the amount of force used) heavily weighs in favor of Defendant Danley. To begin, the indisputable evidence (just recounted) establishes that Plaintiff refused to comply with multiple orders to submit to handcuffs (and actually blocked Defendants' access to and view of the cell's interior), threatened to fight officers (including by telling Defendant Danley to get his shield), and dared Defendant Danley to use pepper spray. "Given these circumstances, the 'need for the use of force' was obvious, immediate, and ongoing." Wilson v. Laureano, No. 3:22CV692, 2024 WL 1683616, at *9 (E.D. Va. Apr. 18, 2024) (unpublished); see also id. at *9-10 (describing detainee's comparable acts of threatening officers, "refus[ing] repeated commands to put his hands out of the [cell-door] slot to be handcuffed," and choosing, when confronted with officer "holding

49

[a] pepper spray canister," to again manifest unwillingness to "comply[] with the officers' orders to avoid being pepper sprayed, [by] defiantly plac[ing] a towel over his face"). And, when met with Plaintiff's aggressive defiance of lawful orders, Defendant Danley merely "applied the amount of force that qualified as necessary to generate compliance . . . . [He] only delivered a short burst of [pepper] spray . . . ." Id. at *10. Overall, "[i]n this instance, [Defendant Danley] faced a sizable 'need for the use of force,' and the 'amount of force used' was necessary, proportionate and appropriate in light of the circumstances. The first _Kingsley_ factor clearly cuts against [this excessive force] claim." Id. (internal citation omitted).

The second Kingsley factor (i.e., the extent of Plaintiff's injury) similarly supports summary judgment for Defendant Danley. As an initial matter, "pepper spray is designed to disable a subject without causing permanent physical injury." Id. (internal quotation marks omitted). Moreover, although Plaintiff averred that, due to the pepper-spray fog, he initially "couldn't breath [sic]" (Docket Entry 56-1 at 5), he then explained that he easily remedied that impact by "wet[ting a] t-shirt and put[ting] it over [his] mouth to breeve [sic]" (id.; see also id. at 5-7 (identifying no other harm from deployment of pepper-spray fogger)). "While certainly not dispositive, this factor cuts against [this excessive force] claim." Wilson, 2024 WL 1683616, at *10; see also Berry v.

50

_Hershberger_, Civ. Action No. 14-3145, 2015 WL 4615949, at *7 (D. Md. Jul. 30, 2015) (unpublished) (reasoning that lack of injury constitutes "strong evidence that the force used did not exceed that which was necessary").

The third _Kingsley_ factor (i.e., any effort to temper/limit the amount of force used) tilts decidedly in Defendant Danley's favor. Specifically, the Fogger-Use Video establishes that Defendant Danley made a good-faith effort to obtain compliance without resort to any force, but "[Plaintiff] refused to cooperate and escalated the situation," _Wilson_, 2024 WL 1683616, at *10, even when he "knew that [meant Defendant Danley was] going to deploy pepper spray," _id._ "[T]he prior use of verbal orders indicates [Defendant Danley made] efforts to temper [the] use of force throughout the incident." _Lambert v. Thomas_, No. 7:20CV2, 2021 WL 1156857, at *6 (W.D. Va. Mar. 26, 2021) (unpublished); _see also_ _White v. Todd_, No. 1:20CV803, 2022 WL 2541921, at *4 (E.D. Va. July 7, 2022) (unpublished) (holding that, where "evidence shows that [the defendant] ordered [the plaintiff] to cuff up for extraction [from his cell, but the plaintiff] refused that command three times," that evidence "shows [] the effort [the defendant] made to avoid using force"). Notably, as catalogued above, after Plaintiff urged Defendant Danley to use pepper spray, Defendant Danley _still_ gave Plaintiff another warning and chance to comply before finally deploying the fogger only when Plaintiff verbally reaffirmed his

51

refusal to submit to handcuffs. "As such, the third factor weighs against [this excessive force] claim." Wilson, 2024 WL 1683616, at *10; see also Johnson v. Johnson, No. 5:20CV1664, 2022 WL 4163050, at *11 (D.S.C. July 11, 2022) (unpublished) (concluding that third Kingsley factor favored the defendant because he "initially tried to avoid the use of force by repeatedly asking [the p]laintiff to comply with being 'cuffed up'"), recommendation adopted, 2022 WL 3224669 (D.S.C. Aug. 10, 2022) (unpublished), aff'd, No. 22-7016, 2023 WL 334418 (4th Cir. Jan. 20, 2023) (unpublished), cert. denied, ___ U.S. ___, 144 S. Ct. 358 (2023).

The fourth and fifth Kingsley factors (i.e., the severity of the security problem at issue and the threat reasonably perceived by Defendant Danley) also fall on Defendant Danley's side of the ledger. For starters, months before this incident, Defendant Danley recognized Plaintiff as "a known security risk, [who] had previously caused problems in the jail," Wilson, 2024 WL 1683616, at *11. (See Docket Entry 38-1, ¶ 5 (describing Plaintiff's behavior toward officers on September 2, 2022, which included "making verbal threats . . . and being generally disruptive and hostile," as his "typical behavior" and reflective of his desire "to constantly . . . prove himself in the[] eyes [of other detainees] by being non-compliant and aggressive toward members of the [d]etention [facility s]taff").) Moreover (as previously documented and discussed), on this occasion, Plaintiff openly

52

threatened to fight Defendants and "refused repeated commands to allow himself to be handcuffed," Wilson, 2024 WL 1683616, at *11, despite "kn[owing] that the pepper spray was about to be deployed," id. The fourth and fifth Kingsley factors therefore line up against Plaintiff, because he "created a serious security risk, and any officer would have reasonably perceived a risk to [his or her] personal safety." Id.; see also White, 2022 WL 2541921, at *4 (deeming evidence of the plaintiff-detainee's "warn[ing to] the [defendant-]officers that he would not get in a restraint chair 'without a fight'" as indicative of "threat [the plaintiff-detainee] posed to the [defendant-]officers").

The sixth (and final) Kingsley factor (i.e., whether Plaintiff actively resisted) likewise favors Defendant Danley. The Fogger-Use Video definitively shows that Plaintiff did not simply passively avoid handcuffing; instead, he actively blocked physical and visual access to his cell, brazenly rejected all orders, threatened to fight officers, and invited Defendant Danley to deploy pepper spray. See Terry v. Jarrell, No. 3:22CV774, 2023 WL 2588456, at *6 (E.D. Va. Mar. 21, 2023) (unpublished) (ruling that the plaintiff-detainee's acts of "disregard[ing] verbal commands and attempts to deescalate the situation, openly challeng[ing the defendant-]officers, [and taking] a fighting stance" constituted active resistance for purposes of sixth Kingsley factor). With all the Kingsley factors aligned against Plaintiff, the Court should

53

grant summary judgment for Defendant Danley, because Plaintiff cannot "establish that Defendant [Danley] used excessive force by deploying pepper spray [through a gap in the] cell door." <u>Wilson</u>, 2024 WL 1683616, at *11.

*Improper Punishment by Defendants*
*(Confinement in Cell after Use of Pepper-Spray Fogger)*

The Complaint alleges that Plaintiff "told [Defendant] Hoover that [Plaintiff would] cuff up after [Defendant Danley] sprayed that pepper spray in [Plaintiff's] room" (Docket Entry 1 at 8), whereupon "[Defendant] Hoover yelled and told [Defendant] Danley [that Plaintiff would] cuff up and that [he] side [sic] [he] cant [sic] breath [sic]" (<u>id.</u>), but "[Defendant] Danley replied back, [']Let him stay in there, his black ass should've been cuffed up[']" (<u>id.</u>). Further, the Complaint states that "[Defendant] Hoover asked [Defendant] Danley[ if] he wanted them to stay there with [Plaintiff], since [he said he] couldn't breath [sic] and [Defendant] Danley was like [']no yall [sic] can come on[']" (<u>id.</u>), at which point, "[Defendants] Hoover and [] Workman walked away and went down the stair's [sic] where [Defendant] Danley was and all three of them left the block and went where ever they went" (<u>id.</u>).

Plaintiff's Affidavit similarly states:

> After being sprayed [by Defendant Danley, Plaintiff] immediately told [Defendant] Hoover [Plaintiff would] submit to the handcuff's [sic] and [he] couldn't breathe. [Defendant] Hoover yelled to [Defendant] Danley and told him [Plaintiff] would submit to cuffs and that [Plaintiff] said [he] could not breathe. [Defendant] Danley yelled to [Defendant] Hoover, "Let his black ass

54

> stay in there he should have already been cuffed," and
> [Defendant] Hoover ask[ed if Defendant Danley] want[ed]
> her to stay there with [Plaintiff] and [Defendant Danley]
> replied "no, yall [sic] can come on." That's when
> [Defendants] Hoover and Workman followed [Defendant]
> Danley. And [Plaintiff] couldn't breath [sic] [so he]
> had to wet [a] t-shirt and put it over [his] mouth to
> breeve [sic].

(Docket Entry 56-1 at 5 (missing quotation mark added).)

Once more, the Fogger-Use Video incontrovertibly contradicts those allegations/averments, as it documents that:

1) after deploying the pepper-spray fogger, Defendant Danley first waited at the cell door and then paced around nearby as Plaintiff intermittently pushed aside his mat to briefly peek out his cell-door window before quickly replacing the mat (all without anyone saying anything) (see Fogger-Use Video, 00:48-01:22);

2) Defendant Danley thereafter moved out of camera range while Defendant Hoover continued to video-record Plaintiff's cell door (with no comments made by anyone) (see id., 01:23-01:45);

3) Plaintiff moved his mat away from the cell door and looked directly out at Defendant Hoover, prompting either she or Defendant Workman to ask if Plaintiff now would "turn around and cuff up," to which he responded by vigorously shaking his head side to side to indicate that he would not, before placing his mat back against the cell door (id., 01:46-01:55); and

4) only then did Defendant Danley advise Defendants Hoover and Workman that they could "return to normal duties," whereupon they began walking away as the recording ended (id., 01:56-02:06).

55

As Defendants observed in the Supplemental Reply:

> This video recording . . . clearly dispels Plaintiff's contentions [that Defendants improperly left him in his cell after the deployment of the pepper-spray fogger], including [Plaintiff's averments] that he "immediately told [Defendant] Hoover [that he would] submit to the handcuff's [sic] and [he] couldn't breathe" or that [Defendant] Danley purportedly said "'Let his black ass stay in there he should have already been cuffed.'"

(Docket Entry 60 at 7-8 (internal citation omitted) (missing quotation marks added) (quoting Docket Entry 56-1 at 5).) In other words, because Plaintiff's version of these events "is blatantly contradicted by the [Fogger-Use Video], . . . [the Court] should not adopt [his] version of the facts," Scott, 550 U.S. at 380, but instead must "view[] the facts in the light depicted by the [Fogger-Use V]ideo[]," id. at 381.

So viewed, the facts cannot sustain a claim that Plaintiff's continued exposure to pepper spray in his cell "amount[ed] to punishment," Bell, 441 U.S. at 535. In route to that conclusion, the Court first must determine if Plaintiff has "show[n] an expressed intent to punish on the part of [Defendants]," id. at 538; see also Short, 87 F.4th at 609 ("[A] showing of subjective intent can still help a pretrial detainee state a claim for action that amounts to punishment, because punishment can consist of actions taken with an expressed intent to punish." (internal quotation marks omitted)). The video evidence (detailed above) conclusively establishes that Defendants did not express an intent to punish Plaintiff in the immediate aftermath of Defendant

56

Danley's discharge of pepper-spray fog; to the contrary, that video evidence shows that they waited patiently to see whether he would comply with their lawful commands to submit to handcuffs until he made clear that he would not comply but instead would continue to resist their efforts to safely remove him from his cell.

"Absent a showing of an expressed intent to punish . . ., th[e Court's] determination [of whether Defendants' action violated the Fourteenth Amendment] generally will turn on whether an alternative purpose to which [their action] may rationally be connected is assignable for [their action], and whether [their action] appears excessive in relation to the alternative purpose assigned to [their action]." Bell, 441 U.S. at 538 (internal brackets and quotation marks omitted). "Thus, if [Defendants' conduct after the deployment of the pepper-spray fogger wa]s reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." Id. at 539 (internal quotation marks omitted); see also id. ("Conversely, if a [governmental action] is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." (italics omitted)). In this situation, the Court should grant summary judgment for Defendants, as they "ha[d] legitimate interests [in securing Plaintiff's compliance with handcuffing] that stem[med] from [the]

57

need to manage the facility in which [he wa]s detained," id. at
540, and their decision to wait for him to so comply "[wa]s
reasonably related to [that] legitimate governmental objective,"
id. at 539, such that it did not "amount to punishment," id.
(internal quotation marks omitted)). See Bratcher v. Hampton Rds.
Reg'l Jail, No. 1:16CV224, 2018 WL 1037052, at *4 (E.D. Va. Feb.
21, 2018) (unpublished) (holding that Due Process Clause claim
challenging "jail policy requiring segregated inmates to wear
handcuffs every time they leave their cells" failed as a matter of
law because "policy was not an exaggerated response to legitimate
safety concerns"), aff'd, 738 F. App'x 793 (4th Cir. 2018);
Cotterman v. Creel, No. 4:14CV642, 2017 WL 990589, at *10 (N.D.
Fla. Feb. 1, 2017) (unpublished) (concluding that handcuffing the
plaintiff-detainee "for transport and movement outside his cell"
constituted "valid security measure [which did] not violate his
constitutional rights and [wa]s not punishment"), recommendation
adopted, 2017 WL 989261 (N.D. Fla. Mar. 14, 2017) (unpublished);
see also, e.g., Cooksey v. Fields, No. C 06-383, 2007 WL 2781248,
at *5 (N.D. Cal. Sept. 20, 2007) (unpublished) ("The handcuffing of
a disobedient and defiant [detainee i]s reasonably related to the
jail's interest in maintaining jail security.").[12]

---

    12 Alternatively, if the Court treated Plaintiff's allegations
about his confinement after the deployment of the pepper-spray
fogger as a continuation of the use of force associated with the
initial deployment of the fogger, the record would forestall a
                                              (continued...)

58

*Excessive Force by Defendants Hoover and Danley*
*(Slamming into Wall and Punching in Ribs While Restrained)*

Per the Complaint, after the events just discussed, Defendants returned to Plaintiff's cell-door within 15 to 20 minutes (see Docket Entry 1 at 8-9) and, when Plaintiff perceived that Defendant Danley "was bout [sic] to spray the pepper spray in [the] room again" (id. at 9), Plaintiff agreed to "cuff up . . . and [he] put [his] arm's [sic] through the trap" (id.), after which "they cuff[ed him] up[, ] called to get [his] door open, . . . put cuff[s] on [his] ankle's [sic] and walked [him] down in full restraints" (id.). The Complaint then alleges as follows:

> When [Plaintiff] got down the step's [sic] walking to the door to leave the block[, Defendant] Hoover ram[med his] chest into the wall which made [his] face hit the wall

---

12(...continued)
finding that any such continuing "force purposely or knowingly used against him was objectively unreasonable," Kingsley, 576 U.S. at 397, considering the relevant factors, see id. Of particular note, Plaintiff's continued refusal to submit to handcuffs and his use of his mat to block his cell-door trap and window (as shown by the Fogger-Use Video) (A) caused his continued confinement in his cell, such that a reasonable "relationship [existed] between the need for the use of force and the amount of force used," id., and (B) confirmed the continued "severity of the security problem at issue," id., as well as the continuation of both "the threat reasonably perceived by [Defendants]," id., and Plaintiff's "active[] resist[ance]," id. Coordinately, the Fogger-Use Video shows that Defendants gave Plaintiff a reasonable opportunity to comply with their commands to submit to handcuffing before leaving his cell-door area, i.e., they tried to limit the length of his exposure to the pepper-spray, and thus tried "to temper or to limit the amount of force," id. Finally, Plaintiff's Affidavit establishes that he suffered no significant "injury," id. (See Docket Entry 56-1 at 5 (averring that Plaintiff "wet [a] t-shirt and put it over [his] mouth to breeve [sic]" and identifying no other harm stemming from exposure to pepper-spray fog).)

59

hard and [Defendant] Danley was waiting the hold [sic]
time . . . [and], after [Defendant] Hoover ram[med
Plaintiff] to the wall[, Defendant] Danley walked up to
[Plaintiff's] side and hit [him] in the right side of
[his] ribs and got in [his] ear and said ["]you must
don't [sic] know who you playing with nigger,["] loud and
clear [enough that Defendants] Hoover and [] Workman
could her [sic] him.

(Id.)

In support of Defendants' request for summary judgment on any

excessive force claim, the Summary Judgment Memorandum (citing

evidence from Defendants Danley and Hoover, as well as two other

detention officers) maintains that "Plaintiff was not hit[ or]

struck . . . in any manner by anyone." (Docket Entry 38 at 12

(citing Docket Entry 38-1, ¶ 24, Docket Entry 38-3, ¶ 23, Docket

Entry 38-5, ¶ 10, and Docket Entry 38-6, ¶ 9).) The Summary

Judgment Memorandum also insists that "[t]he undisputed facts

demonstrate[] that Plaintiff was noncompliant, physically

combative, and threatening throughout the night of December 10-11,

2022. . . . The force used against [him] during the course of the

night was objectively reasonable . . . ." (Id. at 19-20; see also

Docket Entry 38-1, ¶¶ 13 ("While [Defendants] Hoover and [] Workman

were working to escort [Plaintiff] into the Sally Port, I could see

that he was pushing his feet out in front of himself flexing his

leg muscles and twisting and turning his body in order to resist

the[ir] efforts . . . to move him forward. . . . Once they finally

got [him] into the Sally Port, he kept trying to turn toward me to

threaten and insult me . . . . [Defendants] Hoover and [] Workman

60

ordered [Plaintiff] to turn around, but [he] tried to pull away
from them.  To regain control over him, [Defendants] Hoover and []
Workman pressed [him] up against the wall of the Sally Port to
reduce his leverage to resist them.  However, [he] was able to use
his legs and body to push himself away from the wall, which
required me to step in to help [them] to regain control over
him."), 24 (averring that Plaintiff "was not struck, hit . . . or
'slammed' against a wall . . . by [Defendant Danley] or any other
[d]etention [o]fficer during the night of December 10-11, 2022");
Docket Entry 38-3, ¶ 9 ("While [Defendant] Workman and I were
escorting [Plaintiff] down the stairs [in his cell-block] . . .,
[he] became physically resistant, pushing with his legs against the
floor, making it difficult for [us] to control him . . . .  After
we managed to get him into the Sally Point [sic], [he] tried to
turn around and yell at [Defendant] Danley . . . .  I pulled
[Plaintiff] back around to face forward, but he tried to pull away
from me again . . . .  I then placed [him] against the wall of the
Sally Port to gain better control over him . . . .  [Plaintiff] was
not injured in any manner by my placing him against the wall.").)

Plaintiff's Affidavit contests Defendants' foregoing evidence
with these averments:

> As we went down the step's [sic][,] I was asking them
> where I was going (talkin [sic] and cussing).  Soons
> [sic] we was bout [sic] to be out [of] the block[,] she
> ram[med] me to the wall and I hit my head and my right
> side [of] my face.

> [Defendant] Danley walked up to the right side of me and
> hit me in the rib's [sic] and spoke into my ear and said,
> "you dont [sic] know who you fucking with nigger."

(Docket Entry 56-1 at 5; <u>see also</u> <u>id.</u> (appearing to identify
Defendant Hoover as "she" who "ram[med Plaintiff] to the wall" by
averring that "[Defendant] Hoover took [him] off the way [sic]").)

The Supplemental Reply downplays that conflict in the evidence
by arguing (A) that, as to the "'ram[ming of Plaintiff] to the
wall'" (Docket Entry 60 at 8 (quoting Docket Entry 56-1 at 5)),
"Plaintiff does not claim he suffered any harm or injury as a
result" (<u>id.</u>), and (B) that, as to "[Defendant] Danley 'hit[ting
Plaintiff] in the ribs'" (<u>id.</u> at 10 (quoting Docket Entry 56-1 at
5)), "Plaintiff's medical examination by the Jail Nurse on the
morning of December 11, 2022, . . . expressly notes 'No Injuries'
. . . [which] completely dispels his claims that he was beaten or
physically abused in any way" (<u>id.</u> (quoting Docket Entry 41-9 at
2)). However, as previously discussed, "the extent of [
P]laintiff's injury," <u>Kingsley</u>, 576 U.S. at 397, represents but one
of six factors "bear[ing] on the reasonableness or unreasonableness
of the force used," <u>id.</u>; <u>see also</u> <u>Mitchum v. Austin</u>, No.
9:21CV2168, 2022 WL 3908776, at *4 n.5 (D.S.C. July 26, 2022)
(unpublished) ("The Supreme Court has squarely rejected the notion
that [a convicted prisoner] must show more than de minimis injury
to sustain an excessive force claim in the Eighth Amendment
context. This reasoning is equally applicable to the Fourteenth

Amendment context, as the Supreme Court has emphasized that the extent of a pretrial detainee's injury is but one factor a court may consider in determining whether the force used was objectively reasonable." (internal citations omitted)), recommendation adopted, 2022 WL 3908662 (D.S.C. Aug. 30, 2022) (unpublished).

"[T]aking the evidence and all reasonable inferences drawn therefrom in the light most favorable to [Plaintiff]," Henry, 652 F.3d at 531, the other Kingsley factors could support a finding "that the force purposely or knowingly used against him was objectively unreasonable," Kingsley, 576 U.S. at 397. For example, Plaintiff's Affidavit avers that, in reaction to Plaintiff asking (impertinently but while handcuffed and shackled) where Defendants intended to take him, Defendant Hoover "ram[med Plaintiff in]to the wall [causing him to] hit [his] head and [the] right side [of his] face" (Docket Entry 56-1 at 5) and Defendant Danley "hit [Plaintiff] in the rib's [sic]" (id.), while menacingly threatening him with racist rhetoric (see id.), all of which reflects a poor "relationship between the need for the use of force and the amount of force used," Kingsley, 576 U.S. at 397, a lack of "effort . . . to temper or to limit the amount of force," id., a modest (at most) "security problem . . . [and] threat reasonably perceived" id., and an absence of "active[] resist[ance]," id. Consistent with that conclusion, district courts in the Fourth Circuit have held that "slamming against a wall a pretrial detainee who is compliant and

63

poses no physical threat . . . violates the Fourteenth Amendment," McClendon v. Tibbs, No. 2:23CV709, 2024 WL 3297495, at *2 (S.D. W. Va. July 2, 2024) (unpublished), and that "the striking of a restrained detainee who poses no threat to officer safety violates the detainee's right to be free from excessive force," McKelvey v. Western Reg'l Jail, Civ. Action No. 3:13-22206, 2016 WL 11483647, at *21 (S.D. W. Va. Jan. 6, 2016) (unpublished), recommendation adopted, 2016 WL 1090619 (S.D. W. Va. Mar. 21, 2016) (unpublished).

Accordingly, the Court should deny summary judgment for Defendants Hoover and Danley on this excessive force claim.

*Improper Punishment by Defendants*
*(First Use of Restraint Device/Cart and Cool-Down Room)*

The Complaint next alleges that Defendants "put [him] in . . . the restraint chair" (Docket Entry 1 at 9; see also id. (explaining that Defendants "[w]rap[ped his] body up [to] put [him] in the restraint chair")), took him "to this room they call the cool down room" (id.), where "it was so cold" (id. at 10; see also id. (alleging that Plaintiff "only had on boxer's [sic] and a t-shirt")), and "left [him] in that room for (2) two hour's [sic]" (id.). Defendants seek summary judgment on any claim based on those allegations on the ground that "securing Plaintiff in the WRAP restraint to gain control over him was [] objectively reasonable and lawful under the circumstances given [his] continuing active resistance, his threats to harm officers, his threats to spit on officers, and his repeated refusal to obey

64

lawful commands." (Docket Entry 38 at 20; see also Docket Entry 1
at 9 (admitting that, "while [Defendants] w[ere] putting
[Plaintiff] in the [restraint] chair[, he] threaten[ed] to spit in
[their] face[s]," which resulted in them getting "a spit mask" and
"put[ting it] over [his] head"); Docket Entry 38 at 10 (stating
that, after Plaintiff's immobilization, he "made obscene comments
. . . and told [Defendant] Danley that he ([Defendant] Danley) was
going to die" (citing, inter alia, Docket Entry 38-1, ¶ 15, Docket
Entry 38-3, ¶ 11, and Docket Entry 38-4, ¶¶ 23-24)).) The Summary
Judgment Memorandum elaborates that "Plaintiff was [] wheeled to
Room HA-114, . . . [to] get fresh air to decontaminate from any
lingering effects of the OC fogger and to calm down without being
able to disturb other inmates." (Docket Entry 38 at 10 (citing
Docket Entry 38-1, ¶ 15, Docket Entry 38-3, ¶ 11, and Docket Entry
38-4, ¶ 23); see also id. ("Plaintiff was personally observed at
least four times per hour while he was restrained . . . .").)

Plaintiff's Affidavit, however, raises at least two material
questions of fact as to "whether those conditions amount[ed] to
punishment," Bell, 441 U.S. at 535, i.e., whether not just
Defendants' (admitted) confinement of Plaintiff in the restraint
device/cart, but also their relegation of him (secured in the
restraint device/cart) to a room that "was so cold" (Docket Entry
1 at 10), wearing "only . . . boxer's [sic] and a t-shirt" (id.),
"for (2) two hour's [sic]" (id.), qualified as "punitive measures

65

that may not constitutionally be imposed prior to a determination of guilt [rather than] regulatory restraints that may," Bell, 441 U.S. at 537; see also Wilson v. Seiter, 501 U.S. 294, 304 (1991) (recognizing, in Eighth Amendment context, that "warmth" constitutes "identifiable human need" the deprivation of which a convicted prisoner could establish by showing, "for example, a low cell temperature at night combined with a failure to issue blankets"). First, according to Plaintiff's Affidavit, the imposition of those measures occurred (A) right after Defendant Danley "hit [Plaintiff] in the rib's [sic] . . . and said, 'you dont [sic] know who you fucking with nigger'" (Docket Entry 56-1 at 5), and (B) while – in response to Plaintiff "cursing them out for what they [had] done to [him]" (id. at 6) – "[Defendant] Danley . . . call[ed Plaintiff] all type of nigger's [sic] and sa[id] he hope[d Plaintiff] g[o]t raped everyday in prison" (id. (parentheses omitted)). With "the credibility of [that] evidence as forecast assumed," Miller, 913 F.2d at 1087 (internal quotation marks omitted), a reasonable fact-finder could determine that Plaintiff has "show[n ] an expressed intent to punish on the part of [Defendant Danley]," Bell, 441 U.S. at 538; see also Short, 87 F.4th at 609 ("[A] showing of subjective intent can still help a pretrial detainee state a claim for action that amounts to punishment, because punishment can consist of actions taken with an expressed intent to punish." (internal quotation marks omitted)).

66

Second, even "[a]bsent a showing of an expressed intent to punish," Bell, 441 U.S. at 538, and assuming the existence of an alternative purpose (other than punishment) for Defendants to restrain and to isolate Plaintiff for some period, a reasonable jury could find that the specific conditions of restraint and isolation imposed by Defendants violated the Fourteenth Amendment because those conditions "appear[ed] excessive in relation to th[at] alternative purpose," id. (internal quotation marks omitted). Most notably, whereas Plaintiff's Affidavit avers that "the room [where Defendants kept him for two hours] only wearing boxer[s], sock's [sic] and [a] t-shirt . . . was so cold [he] couldnt [sic] feel [his] leg's [sic]" (Docket Entry 56-1 at 6), Defendants have not offered any non-punitive explanation for subjecting Plaintiff to such conditions (see Docket Entry 38 at 8-10 (summarizing evidence concerning Defendants' confinement of Plaintiff in restraint device/cart without mentioning any rationale for exposing him to very cold temperatures with little clothing), 19 (citing authority sanctioning use of restraint chairs/devices, but not addressing exposure to very cold temperatures with little clothing), 20 (arguing only that "securing Plaintiff in the WRAP restraint to gain control over him was [] objectively reasonable and lawful under the circumstances"); Docket Entry 60 at 9 (intimating (A) that Defendants placed Plaintiff "into Room HA-114, [so he] could not disturb other inmates and . . . would have fresh

67

air to help him recover from any lingering effects of the OC fogger" and (B) that Plaintiff's Affidavit exaggerates the frigidity of the room, based on a "short cell phone video[] depicting [D]efendants wheeling Plaintiff . . . into Room HA-114," which does not reveal "any complaints by Plaintiff . . . regarding the temperature in HA-144")).[13]

Given those considerations, the Court should deny summary judgment for Defendants on this claim for improper punishment.

*Excessive Force by Defendant Hoover*
*(Slamming to Floor While in Restraints)*

The final excessive force claim articulated in the Complaint arose from events that occurred at the end of Plaintiff's above-discussed, two-hour stint in the cool-down room, when Defendants "came back and . . . took [him] back to the [cell] block" (Docket Entry 1 at 10), during which time he "continue[d] to talk shit to them [until he] got to the block" (id.). The Complaint further alleges that, once inside the cell block, "[Defendants] Hoover and

_____

13 Only the last 17 seconds of the video in question – Video 3 within Exhibit 2 to the Danley Affidavit (see Docket Entry 38-1, ¶¶ 15 (averring that, upon "arriv[al] at HA-114," Defendant Danley "took out [his] official issued cell phone to start recording the statements that [Plaintiff] was making"), 16 ("Contained on the CD-ROM identified as Exhibit 2 are the two short video recordings that I made using my cell phone of the statements that [Plaintiff] was making . . . . I stopped recording once we had secured [him] inside of HA-114 . . . .")) – covers Plaintiff's placement in the room at issue. The absence of any objection by Plaintiff to the room's temperature during that short time-span does not "blatantly contradict[ Plaintiff's account of the room's temperature], so that no reasonable jury could believe it," Scott, 550 U.S. at 380.

68

[] Workman had [Plaintiff's] arm's [sic] while they walked [him] in the block" (id.), whereupon Plaintiff – still "in full restraint's [sic], cuffed behind [his] back, [with the] spit mask on [his] whole head" (id.) – resumed insulting Defendants Hoover and Danley (see id.). Plaintiff then allegedly asked "[Defendant] Hoover [to] stop speed walking" (id.), adding that the "[leg] cuff's [sic] [were] cutting [his] ankles" (id.), "and out of no where [sic] she put her right leg in front of [his] left leg and slammed [him] so hard [to the ground that he] blacked out for a few seconds" (id.; see also id. (alleging that, "[w]hen [Defendant] Hoover slammed [Plaintiff], [he] went down head first and hit [his] temple so hard on the floor[ that he] blacked out")).

The Summary Judgment Memorandum agrees that "[Defendant] Hoover and [another detention officer] escorted Plaintiff back to his cell in Green Block, holding onto him by his upper arms" (Docket Entry 38 at 10); however, it attributes to Plaintiff not just verbal abuse, but also (A) "physical[] resistan[ce]" (id.; see also, e.g., Docket Entry 38-1, ¶ 17 ("[Plaintiff] once again began pushing back against the [d]etention [o]fficers who were escorting him by his upper arms, flexing his legs to resist the efforts to move him forward.")), and (B) threatening comments (see Docket Entry 38 at 10-11 (stating that Plaintiff "exclaim[ed] 'I just took that ride to know what it's like when I punch one of y'all in the face'"); accord, e.g., Docket Entry 38-1, ¶ 17). And, contrary to

69

the Complaint's (above-recited) allegations that Defendant Hoover violently tripped Plaintiff, catapulting him head-first onto the floor, the Summary Judgment Memorandum states that, "[i]n response to Plaintiff's physical aggression and resistance, [Defendant] Hoover [and another detention officer] lowered Plaintiff to the floor." (Docket Entry 38 at 11; see also Docket Entry 38-1, ¶ 17 (averring that Plaintiff "was assisted down to the floor in a controlled manner"); Docket Entry 38-3, ¶ 15 (averring that Defendant Hoover and another detention officer "assisted [Plaintiff] down onto the floor"); Docket Entry 38-4, ¶ 26 ("[Plaintiff] then became physically hostile and aggressive, attempting to pull away from [Defendant] Hoover and [another detention officer]. To regain control over [Plaintiff], [he] was taken down to the floor using the controlled fall technique."); Docket Entry 38-5, ¶ 5 ("[Defendant] Hoover ordered [Plaintiff] to stop resisting us and to go peacefully back to his cell. [Plaintiff] refused to obey her orders and continued to try to prevent us from getting him back to his cell. In response, [Defendant] Hoover utilized a leg sweep maneuver against [Plaintiff] to get [him] off-balance. [Defendant] Hoover and I then assisted [Plaintiff] to the floor. We lowered [him] to the floor and made sure that he did not make contact with the floor with any significant force.").)

70

Based on that version of events, the Summary Judgment
Memorandum argues that, "[t]o the extent that [D]efendant Hoover
(or anyone else) initiated a takedown maneuver to get [] Plaintiff
off of his feet in response to his active physical resistance, such
limited force was objectively reasonable and tempered under the
circumstances."  (Docket Entry 38 at 20.)  That argument does not
entitle Defendant Hoover to summary judgment on this excessive
force claim, because these averments in Plaintiff's Affidavit
create a material factual dispute about the nature, extent, and
reasonableness of the force she used:

> . . . [Defendants] took me out [of] the restraint[
> device/cart] and started walking me back to the [cell]
> block and I ask[ed Defendant] Hoover could she slow down
> because the leg restraint's [sic] was [sic] cutting my
> skin.  [Defendant] Hoover than [sic] put her leg in front
> of my left leg and used force and slam[med] me on my
> head/temple so hard I went to sleep and when they picked
> me up that [was] what woke me up.  And I had leg
> restraints, hands cuffed to my back, spit mask on.  All
> I was doing was cursing her out.

(Docket Entry 56-1 at 6.)

Like with the previously discussed, excessive force claim
against Defendants Hoover and Danley, the Supplemental Reply
attempts to discount Plaintiff's averment "that [Defendant] Hoover
'slam[med him] on [his] head/temple so hard [he] went to sleep'"
(Docket Entry 60 at 10 (quoting Docket Entry 56-1 at 6)), by
highlighting the fact that "Plaintiff's medical examination by the
Jail Nurse on the morning of December 11, 2022, . . . expressly
notes 'No Injuries' nor any loss of consciousness" (id. (quoting

71

and citing Docket Entry 41-9 at 2)).  Once again, that attempt does not warrant summary judgment against Plaintiff because, beyond "the extent of [his] injury," Kingsley, 576 U.S. at 397, the Court must consider five additional factors "bear[ing] on the reasonableness or unreasonableness of the force used," id., and, "taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to [Plaintiff]," Henry, 652 F.3d at 531, consideration of those factors would permit a reasonable jury to find "that the force purposely or knowingly used against him was objectively unreasonable," Kingsley, 576 U.S. at 397.

In that regard, Plaintiff has averred that, without taking any interim, less forceful steps, Defendant Hoover violently kicked his shackled legs out from under him, causing his head to hit the floor, for cursing her for walking so fast that the shackles cut his ankles.  (See Docket Entry 56-1 at 6.)  That account (if accepted by the jury) would support a finding that Defendant Hoover used excessive force, as it would tend to show a disproportionate "relationship between the need for the use of force and the amount of force used," Kingsley, 576 U.S. at 397, a lack of "effort . . . to temper or to limit the amount of force," id., a modest (at most) "security problem . . . [and] threat reasonably perceived" id., and an absence of "active[] resist[ance]," id.  "[I]ndeed, [courts have concluded that] knocking over a handcuffed detainee so that his head strikes the floor clearly could support a claim for excessive

72

force." <u>Hopkins v. MTA Bus</u>, Civ. Action Nos. 13-1496, 13-1378, 2014 WL 4662525, at *5 (D. Md. Sept. 16, 2014) (unpublished); <u>see also</u> <u>Harris v. City of Circleville</u>, 583 F.3d 356, 365-66 (6th Cir. 2009) (ruling that the plaintiff's "version of the events support[ed] a holding that [the d]efendants violated [his] Fourth Amendment right to be free from excessive force," where the plaintiff alleged that, after he objected to his handling by one of the defendants, the defendant "kicked [the hand-cuffed plaintiff's] leg out from under him and pushed him in the back, causing him to fall and hit his head," with the defendants having "said nothing to [the plaintiff] before taking him to the ground").

As a result, the Court should deny summary judgment for Defendant Hoover on this excessive force claim.

*Improper Punishment by Defendants Hoover and Danley*
*(Second Use of Restraint Device/Cool-Down Room*
*followed by Confinement in Suicide-Risk Room)*

The Complaint gives this description of the remaining events of the night of December 10-11, 2022:

> After [Defendant] Hoover slammed [Plaintiff] on [his] head, . . . [he] heard [her] yelling ["]We got [sic] to put him in the chair again["] and they picked [him] up and carried [him] back out [of] the [cell] block and took [him] back to the hall way [sic] and put [him] back in they [sic] chair and took [him] back to . . . the cool down room . . . .
>
> They left [him] in that room for (2) two more hour's [sic], [and] then <u>[Defendants] Hoover and [] Danley</u> and one more officer <u>came and got [Plaintiff]</u>. [Plaintiff] though [sic] they was [sic] taking [him] back to the hole which is [in G]reen [B]lock down stair's [sic] but this time they had different plans for [him]. <u>They took [him]</u>

73

to booking and put [him] on suicide watch. [Plaintiff]
never said [he] was gonna [sic] kill [him]self[. Once
they] g[o]t to booking[,] they t[ook him] out [of] the
[restraint] chair and start[ed] unstrapping [him and]
then they t[ook him] in suicide room 124B or B124.
[Defendant] Hoover walk[ed Plaintiff] in the room [and
told him] to lay on [his] stomach, face down. Then
[Defendant] Hoover start[ed] cutting [Plaintiff's]
clothe's [sic] off [and he told] her ["]you know you
[are] not supposed to be cutting my clothes off[,] not no
female[."]

While [Defendant] Hoover [was] cutting [Plaintiff's]
clothe's [sic] off, [he] asked [Defendant] Danley why []
a female officer [was] cutting off[] a male [detainee's]
clothe's [sic], when [there were] (3) three male
officer[s] right [t]here. [Defendant Danley] didnt [sic]
respon[d]. So when [Defendant] Hoover removed all [of
Plaintiff's] clothe's [sic], [he] was laying face down
butt naked. Then she told [him] to roll over on [his]
side and she helped [him] get to [his] feet and [he]
still was in handcuff's [sic]. [Defendant] Hoover walked
[Plaintiff] to the door and then put the rop[e] throw
[sic] the trap and [Plaintiff] beened [sic] down and
[Defendant Hoover] to [sic] the handcuff's [sic] off
[him]. Then [she] closed the trap and left, while
[Plaintiff] layed down and cried and prayed to God.

(Docket Entry 1 at 11 (emphasis added) (paragraph numbers

omitted).)[14]

_____

14 Liberally construed, the Complaint (as quoted above)
identifies Defendant Hoover as one of the officers who returned
Plaintiff to the cool-down room the second time, but does not
sufficiently identify Defendants Danley and Workman (or anyone
else) as participants in that activity. (See Docket Entry 1 at
11.) Furthermore, as the underscored portion of the Complaint
above reflects, the Complaint alleges that Defendants Hoover and
Danley, but not Defendant Workman, participated in Plaintiff's
transfer to the suicide-risk room. (See id.) Due to the absence
of any reference to Defendant Workman in this portion of the
Complaint, the Court should not treat this claim as lodged against
her. See, e.g., Maisha v. University of N.C., No. 1:12CV371, 2013
WL 1232947, at *6 (M.D.N.C. Mar. 27, 2013) (unpublished) (Eagles,
J.) (dismissing claim as against certain of the defendants "because
(continued...)

74

In generally consistent fashion (at least as to Defendant Hoover's role), Plaintiff's Affidavit states:

> They picked me up and put me back in the restraint chair the second time and let me sit in the cool down room for (2) two more hours for the second time. And after the two hours was up, they took me to booking this time and[,] when I rolled in, I seen [sic] three male officer[s] standing waiting on me. [Defendant] Hoover asked an [sic] male officer to help her pick me up out [of] the chair so they could take the body restraint's [sic] off. When they got me out [of] the restraint's [sic], [Defendant] Hoover told me to lay on my stomach and I asked for what and [she] replied "so I can cut your clothes off," and I replied why when [there are] three male CO's right here and she kept on cutting my clothes off and help[ed] me stand up and made me back up naked with handcuff's [sic] on behind my back and she took the cuff[s] off.

(Docket Entry 56-1 at 6-7.)

The Summary Judgment Memorandum confirms that, following Plaintiff's aborted return trip to Green Block, Defendants Hoover and Danley participated in "pick[ing] Plaintiff up [from the floor] and carr[ying] him back to the WRAP restraint device" (Docket Entry 38 at 11; see also, e.g., Docket Entry 38-3, ¶ 15 (averring that Plaintiff's placement "back into the Wrap restraint device" occurred because "he had not stopped his aggressive and non-compliant behavior")), with the added information that "Plaintiff physically resisted the[ir] efforts to place him back into the

--------

14(...continued)
[the complaint did] not allege[ that] they engaged in any specific conduct which would give rise to [that] claim," was "vague as to who took what action," and "ma[de] no specific allegations as to [those defendants]"), aff'd, 641 F. App'x 246 (4th Cir. 2016).

75

WRAP device" (Docket Entry 38 at 11; accord, e.g., Docket Entry 38-1, ¶ 18)). Similarly, the Summary Judgment Memorandum acknowledges that, once "secure[d]" (Docket Entry 38 at 11), Plaintiff "was returned to Room HA-114" (id.; see also, e.g., Docket Entry 38-1, ¶¶ 17-18 (setting out Defendant Danley's averments about his involvement in restraining Plaintiff and confining him in "room HA-114" on second occasion); Docket Entry 38-3, ¶ 16 ("Once we had properly secured [Plaintiff] into the Wrap, we placed him back into the cart and returned him to the HA-114 recreation room. We completed this process at approximately 1:38 a.m.")).

As concerns Plaintiff's subsequent transfer to the suicide-risk room, the Summary Judgment Memorandum offers this chronology:

> At approximately 3:45 a.m., [Defendants] and [a male o]fficer [] removed Plaintiff from the WRAP device. Plaintiff continued to be aggressive and noncompliant. Concluding that returning Plaintiff to his cell would accomplish nothing more than giving him yet another opportunity to disturb and incite other inmates; that placing Plaintiff into the WRAP device a third time would not be effective in getting him to cease his aggressive and non-compliant behavior; and concerned about [] Plaintiff's emotional volatility and violent nature, the [o]fficers decided to place Plaintiff into a safety observation cell equipped with padded walls and floor, where he could be personally observed at least four times an hour.
>
> [Defendant] Hoover and [a male officer] escorted Plaintiff into the safety observation cell, where Plaintiff was lowered to the floor into the prone position. Inmates who are placed in a safety observation cell are dressed in a suicide smock/gown made of rip-proof material to protect them from self-harm. [Defendant] Hoover, who as a Corporal was authorized by policy to utilize safety shears, used them to remove the Plaintiff's t-shirt and shorts, which could not be

76

> removed intact because Plaintiff was still restrained in
> handcuffs and leg restraints for officer safety. After
> [the male officer] removed [] Plaintiff's leg restraints,
> [the male officer] and [Defendant] Hoover exited the
> safety observation cell while Plaintiff was still lying
> face down. [The male officer] thereafter removed the
> handcuffs from [] Plaintiff's wrists via the pass-through
> slot in the cell door.

(Docket Entry 38 at 11-12 (internal citations omitted) (citing

Docket Entry 38-1, ¶¶ 20-21, Docket Entry 38-3, ¶¶ 18-20, Docket

Entry 38-4, ¶ 29, and Docket Entry 38-6, ¶¶ 4, 6-7); see also

Docket Entry 38-1, ¶ 20 ("I made the decision to have [Plaintiff]

placed in . . . one of our safety observation cells . . . ."), 21

("I left it to [Defendant] Hoover and [a male officer] to ensure

that . . . [Plaintiff] was dressed in a suicide smock. As a

Corporal, [Defendant] Hoover was trained and authorized to utilize

safety shears to remove [Plaintiff's] clothing . . . so that he

could be dressed in a suicide smock.").)

To justify the request for summary judgment in favor of

Defendants Hoover and Danley on any claim that they improperly

punished Plaintiff by confining him in the suicide-risk room and

stripping him, the Summary Judgment Memorandum reasons that:

> [P]lacing Plaintiff into a safety observation cell was
> objectively reasonable and entirely consistent with 10A
> NCAC 14J .0601(c)(4), which requires that an inmate who
> engages in (A) physically hitting or trying to hit an
> officer; (B) verbal abuse of other people;
> (C) threatening other people, or threatening [] or
> engaging in self-injury; or (D) screaming, crying,
> laughing uncontrollably, or refusing to talk [] be placed
> on special watch.

(Docket Entry 38 at 20-21; <u>see also</u> Docket Entry 38-1, ¶ 20 ("[Plaintiff] had made repeated threats that he was going to kill members of the [d]etention [s]taff . . . . [He] also had a lengthy history of assaulting [d]etention [o]fficers . . . . Consequently, consistent with 10A NCAC 14J .0601(c), I made the decision to have [Plaintiff] placed in . . . one of our safety observation cells where intoxicated, suicidal, violent, emotionally disturbed, or other inmates who warrant being placed on special watch can be directly observed by [d]etention [o]fficers manning the booking area. Inmates who are placed in a safety cell on special watch are dressed in a suicide smock for their safety . . . .").)

Assuming the "[a]bsen[ce of] a showing of an expressed intent to punish," <u>Bell</u>, 441 U.S. at 538, and the presence of an alternative purpose (other than punishment) for Defendants Hoover and Danley to restrain and to isolate Plaintiff a second time, a reasonable jury nonetheless could find them liable under the Fourteenth Amendment, because their chosen means of restraint and isolation "appear[ed] excessive in relation to th[at] alternative purpose," <u>id.</u> (internal quotation marks omitted). Beginning with the second trip to the cool-down room (and just as with the first such trip), in the face of Plaintiff's averments about the very cold conditions he endured there (<u>see</u> Docket Entry 56-1 at 6), Defendants failed to present a non-punitive rationale for that aspect of his confinement (<u>see</u> Docket Entry 38 at 11, 20).

Additionally, in light of the lack of any evidence that Plaintiff ever voiced or otherwise manifested any intent to harm himself, a reasonable jury (A) could find the decision to confine him in the suicide-risk room and to strip him of his clothes "[wa]s not reasonably related to a legitimate goal [but instead wa]s arbitrary or purposeless," Bell, 441 U.S. at 539, and thus (B) could "infer that the purpose of th[at] governmental action [wa]s punishment that may not constitutionally be inflicted upon [Plaintiff as a] detainee[]," id.; see also Disessa v. Massachusetts, No. 1:18CV11024, 2020 WL 1158254, at *8 (D. Mass. Mar. 10, 2020) (unpublished) ("If correctional officers place a prisoner on suicide watch . . . as an arbitrary or retaliatory punishment, a court can . . . find a violation of law.").

The Summary Judgment Memorandum's invocation of a North Carolina administrative regulation does not alter that conclusion. That regulation states, in part, that:

> Special watch shall be used for the following reasons:
>
> (1) an inmate with a medical record . . . that indicates the inmate has attempted suicide at a previous time, unless the inmate is seen by a physician who determines a special watch is not needed;
>
> (2) an inmate who reports a previous suicide attempt or threatens to commit suicide during their initial screening . . ., unless the inmate is seen by a physician who determines a special watch is not needed;
>
> (3) an inmate who has been assigned to special watch by medical or mental health personnel of the jail or an officer;

79

(4) an inmate who displays any of the following behavior:

    (A) physically hitting or trying to hit an officer;

    (B) verbal abuse of other people;

    (C) threatening other people, or threatening to [engage] or engaging in self-injury;

    (D) screaming, crying, laughing uncontrollably, or refusing to talk; and

(5) an inmate who is intoxicated by alcohol or drug use as determined at intake . . . .

10A N.C. Admin. Code 14J.0601(c).

Reasonably read, that regulation lists subparagraphs (A) through (D) of paragraph (4) to limit (at least facially[15]) the reasons for which jail officials may place detainees on "special watch," not to mandate that jail officials place all detainees who fall within that list on "special watch." Moreover, the record reflects that Defendants operated with that understanding in their dealings with Plaintiff. For example, Defendant Danley has averred that, prior to the evening of December 10-11, 2022, Plaintiff "had a lengthy history of assaulting [d]etention [o]fficers" (Docket Entry 38-1, ¶ 20), and that his "typical behavior" (id., ¶ 5) included "making verbal threats and vulgar commen[t]s toward [detention officers] and being generally . . . hostile" (id.). If

_____

15 The literal language of paragraph (3) effectively allows any jail officer to place any inmate on "special watch" for any reason chosen by the officer by authorizing the use of "special watch" for any "inmate who has been assigned to special watch by . . . an officer." 10A N.C. Admin. Code 14J.0601(c)(3).

so and if Defendants (and their colleagues) understood the cited regulation as "requir[ing] that an inmate who engages in (A) physically hitting or trying to hit an officer; (B) verbal abuse of other people; [or] (C) threatening other people . . . be placed on special watch" (Docket Entry 38 at 20-21), then Plaintiff would have been on "special watch" long before December 10, 2022.

Furthermore, even if (A) the cited regulation did "require[] that [every] inmate who . . . tr[ied] to hit an officer[, ] verbal[ly] abuse [] other people[, or ] threaten[] other people . . . be placed on special watch" (id.), and (B) Defendants could explain why they (or their fellow detention officers) had not already placed Plaintiff on "special watch" due to his "lengthy history of assaulting [d]etention [o]fficers" (Docket Entry 38-1, ¶ 20) or his "typical behavior" (id., ¶ 5) of "making verbal threats and vulgar commen[t]s toward [detention officers]" (id.), the cited regulation did not require that such "special watch" consist of placing Plaintiff in a rubber room and forcibly stripping off his clothing, see 10A N.C. Admin. Code 14J.0601(c) (mandating only these conditions "[w]hile an inmate is on special watch": "[T]he jail shall have an officer conduct special watch rounds and observe the inmate not less than four times within a 60 minute period on an irregular basis with not more than 20 minutes between rounds. Special watch shall be conducted 24 hours a day, 7 days a week. The special watch rounds shall be documented. The

81

jail shall maintain written or electronic records of the special watch rounds and shall make these records available to the Construction Section during an inspection upon request.").

For all these reasons, the Court should deny summary judgment for Defendants Hoover and Danley on Plaintiff's claim that they improperly punished him by returning him to the cool-down room and then confining (and stripping) him in the suicide-risk room.

### Privacy Violation by Defendants Hoover and Danley (Forcible Removal of Plaintiff's T-Shirt and Boxers)

Defendant Hoover's above-detailed involvement (with Defendant Danley's approval) in stripping Plaintiff naked in the suicide-risk room gives rise to a separate claim against them, because (as previously discussed) the Fourth Circuit has declared that "a pretrial detainee [] ha[s] a general right, constitutionally protected, not to be subjected by state action to involuntary exposure in a state of nakedness to members of the opposite sex unless that exposure was reasonably necessary in maintaining [the pretrial detainee's] otherwise legal detention," Fisher, 690 F.2d at 1142. Seizing on the final part of that formulation of Plaintiff's constitutional privacy right, the Summary Judgment Memorandum contends that "[Defendant] Hoover['s act of] cutting off Plaintiff's jail clothes . . . was necessary under the circumstances . . ., as by policy [] Plaintiff was required to be dressed in a rip-proof suicide smock/gown and his clothes could not be removed intact while he was still in restraints for reasons of

82

officer safety." (Docket Entry 38 at 24; see also id. at 12 ("Inmates who are placed in a safety observation cell are dressed in a suicide smock/gown made of rip-proof material to protect them from self-harm." (citing Docket Entry 38-1, ¶ 21, Docket Entry 38-3, ¶ 19, Docket Entry 38-4, ¶ 29, and Docket Entry 38-6, ¶ 6)).)[16]

That contention does not entitle Defendants Hoover and Danley to summary judgment on this claim. As an initial matter (and as highlighted in the discussion of the preceding claim), the record contains no evidence that Plaintiff posed any risk of self-harm and thus a reasonable fact-finder could determine that (A) the application of any clothing-removal policy to him "[wa]s not reasonably related to a legitimate goal [but instead wa]s arbitrary or purposeless," Bell, 441 U.S. at 539, and (B) therefore not "reasonably necessary in maintaining h[is] otherwise legal detention," Fisher, 690 F.2d at 1142. And, in any event, Defendants have failed to explain why Defendants Danley and Hoover could not have relied on Defendant Danley (a male sergeant), rather

_____

16 The Hoover Affidavit also intimates that Defendant Hoover did not actually view Plaintiff's genitals. (See Docket Entry 38-3, ¶¶ 19-20 (averring that Defendant Hoover "cut [Plaintiff's] boxers and t-shirt down the sides while he was lying face down," that she "exited Cell B124 and closed the door, while [he] was still lying face down," that a male officer "then took charge of removing [Plaintiff's] handcuffs," and that she "took care to turn [her] head so as not to observe [Plaintiff's] genitals").) Plaintiff's Affidavit, however, raises a material factual question on that front. (See Docket Entry 56-1 at 7 (averring that, after Defendant Hoover "cut[ Plaintiff's] clothes off[, she] help[ed] [him] stand up and made [him] back up naked with handcuff's [sic] on behind [his] back and she took the cuff[s] off").)

than Defendant Hoover (a female corporal), to forcibly strip Plaintiff. (*See* Docket Entry 38-3, ¶ 19 ("At the Moore County Detention Center, only supervisors (Sergeants or Corporals . . .) are permitted to utilize safety/trauma shears."); *see also* Docket Entry 38-1, ¶ 8 ("I was on duty at the Moore County Detention Center during the night shift on December 10-11, 2022. I was the Sergeant for the shift and was the ranking officer on duty.").)

As such, the Court should deny summary judgment for Defendants Hoover and Danley on this claim.

<u>CONCLUSION</u>

Material factual disputes exist as to whether, on September 2, 2022, Defendant Workman discharged a pepper-gun and/or a pepper-spray device at Plaintiff and compelled him to appear naked before her without adequate justification, both without adequate justification; however, the record establishes as a matter of law that Defendants Danley and Workman did <u>not</u> improperly punish Plaintiff by denying his request to wash off pepper spray in the shower area. In addition, as to the events of December 10-11, 2022, video evidence (of unchallenged authenticity) conclusively forecloses Plaintiff's claims that Defendant Danley deployed a pepper-spray fogger into Plaintiff's cell without adequate justification and that Defendants thereafter improperly punished Plaintiff by leaving him in that cell without adequate justification, but material factual disputes remain regarding

84

whether Defendants Hoover (on two occasions hours apart) and Danley
(on one occasion) struck Plaintiff while restrained without
adequate justification, as well as whether Defendants Hoover and
Danley together on two occasions, joined by Defendant Workman on
the first occasion, confined Plaintiff in a restraint device/cart
in a very cold room and then (on the second occasion) also confined
Plaintiff in a suicide-risk room, where Defendant Hoover (at
Defendant Danley's behest) cut off Plaintiff's clothes and viewed
him naked, all without adequate justification.[17]

_____

17 The instant Motion nominally refers to Defendants'
"entitle[ment] to qualified immunity" (Docket Entry 37 at 1);
however, the Summary Judgment Memorandum does not develop that
reference beyond this bald assertion:

> Even assuming for the sake of argument that any of the
> incidents alleged by [] Plaintiff constituted excessive
> force under the circumstances (which they did not) or
> otherwise violated his constitutional rights, neither
> [Defendants] Danley's, Hoover's, nor Workman's conduct
> violated clearly established law of which a reasonable
> officer under the circumstances would have been aware.
> Consequently, [ D]efendants are each entitled to
> qualified immunity.

(Docket Entry 38 at 25.) "A party waives an argument . . . by
failing to develop its argument — even if its brief takes a passing
shot at the issue." Grayson O Co. v. Agadir Int'l LLC, 856 F.3d
307, 316 (4th Cir. 2017) (brackets and internal quotation marks
omitted). Plainly stated, "[a] party must actually develop its
argument." Hensley on behalf of N.C. v. Price, 876 F.3d 573, 580
n.5 (4th Cir. 2017) (internal brackets and quotation marks
omitted). "[The] bare recitation of the elements of a qualified
immunity defense does not clear that hurdle." Id. "[Defendants]
may again raise qualified immunity at an appropriate time at trial,
but [they cannot prevail on that defense] . . . at the summary
judgment stage." Id.

**IT IS THEREFORE RECOMMENDED** that the instant Motion (Docket Entry 37) be granted in part and denied in part, in that the Court:

(I) should deny summary judgment as to Plaintiff's Fourteenth Amendment claims,

      (a) from September 2, 2022,

         (i) against Defendant Workman for using excessive force by discharging a pepper-ball gun and/or pepper-spray device at Plaintiff, <u>and</u>

         (ii) against Defendant Workman for violating Plaintiff's privacy rights by intentionally and unnecessarily viewing his genitals, <u>and</u>

      (b) from December 10-11, 2022,

         (i) against Defendants Hoover and Danley for using excessive force by slamming Plaintiff's face into a wall and punching him in the ribs, respectively,

         (ii) against Defendants for improperly punishing Plaintiff by confining him in a restraint device/cart in a very cold room with little clothing for two hours,

         (iii) against Defendant Hoover for using excessive force by tripping/slamming Plaintiff onto the floor,

         (iv) against Defendants Hoover and Danley for improperly punishing Plaintiff by again confining him in a restraint device/cart in a very cold room with little clothing for two hours and then confining him in a suicide-risk room, <u>and</u>

(v) against Defendants Hoover and Danley for violating Plaintiff's privacy rights by having Defendant Hoover cut off Plaintiff's clothes and remove his handcuffs, thereby intentionally and unnecessarily viewing his genitals; <u>but</u>

(II) should grant summary judgment for Defendants on all other claims in the Complaint (Docket Entries 1, 3), which survived initial screening (<u>see</u> Docket Entry 7 (adopting Docket Entry 4)).

  /s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

May 21, 2025